996 A.2d 986

NEW JERSEY DIVISION OF YOUTH AND FAMILY
SERVICES, PLAINTIFF, v. I.S., DEFENDANT.

IN THE MATTER OF THE GUARDIANSHIP
OF R.A., JR., A MINOR.

NEW JERSEY DIVISION OF YOUTH AND FAMILY
SERVICES, PLAINTIFF–RESPONDENT, v.
C.M., DEFENDANT–APPELLANT.

IN THE MATTER OF THE GUARDIANSHIP
OF R.A., JR., MINOR–RESPONDENT.

Argued September 30, 2009—Re-argued April
26, 2010—Decided June 1, 2010.

LaVecchia, J., filed a dissenting opinion in which Long and Albin, JJ., join.

———

*Beatrix W. Shear*, Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars*, Public Defender Parental Representation, attorney; *Ms. Shear* and *Evelyn F. Garcia*, Designated Counsel, on the briefs).

*Noel C. Devlin*, Assistant Deputy Public Defender, argued the cause for respondent R.A. Jr. (*Yvonne Smith Segars*, Public Defender, Law Guardian, attorney).

*Ann Avram Huber*, Deputy Attorney General, argued the cause for respondent New Jersey Division of Youth and Family Services (*Anne Milgram*, Attorney General of New Jersey, attorney; *Andrea M. Silkowitz*, Assistant Attorney General, of counsel; *Ms. Huber* and *Carla M. Silva*, Deputy Attorney General, on the briefs).

*Mary M. McManus–Smith*, argued the cause for *amicus curiae* Legal Services of New Jersey (*Melville D. Miller, Jr.*, President, attorney; *Ms. McManus–Smith*, *Mr. Miller*, *Diana Dunker*, and *Jeyanthi C. Rajaraman*, on the brief).

*Mary E. Coogan*, submitted a brief on behalf of *amicus curiae* Association for Children of New Jersey.

Justice RIVERA–SOTO delivered the opinion of the Court.

In this case, a father was ordered to forfeit his parental rights to his natural son because he did not rush forward quickly enough, in the trial court's and Appellate Division's view, to take on fully and solely the care and custody of that child. The record demonstrates that the revelation that he had an out-of-wedlock child rocked his stable and successful marriage. Faced with the nearly impossible choice between attempting to salvage that marriage— which had served as the center for successfully nurturing four other children, three to adulthood—or instantly asserting his right to take on the rearing of this new child, he hesitated. In reality,

this father was faced with what can be described as a "Hobson's choice," that is, no choice at all. Despite trying his best both to save his marriage and to establish a relationship with his new child by offering family members and seeking child care, he lost both his marriage and his child, even though he did offer himself as the child's caregiver and made all reasonable arrangements to carry out his parenting responsibilities.

The comprehensive and well-established judicial and legislative mechanisms adopted and in place to gauge whether a parent's right to his child should be severed permanently cannot sustain that result. Our jurisprudence, as codified by the Legislature, makes clear that the process for terminating parental rights is a difficult and intentionally rigorous one that must be satisfied by a heightened burden of proof, by clear and convincing evidence. Because the record in this matter falls short of that exacting standard, the termination of this father's parental rights cannot be affirmed. We therefore reverse and vacate that judgment, remanding the matter to the trial court for the immediate development and implementation of a reasonable, realistic and meaningful reunification plan, bearing always in mind this child's best interests.

## I.

During 2005, Irene, who has a long history of substance abuse, had a brief extramarital affair with defendant C.M., a then fifty-six year old married man and father of four children with his wife. That affair resulted in the April 3, 2006 birth of the child Richard Jr.[1] By that point, Irene had had a decade-long involvement with the Division of Youth & Family Services (DYFS), as Irene's three earlier children had been removed from Irene's custody and placed with relatives under kinship legal guardianships.[2] In late

---

[1] Irene, Richard Jr. and any other proper names used in this dissent are pseudonyms used to preserve the confidentiality of the persons involved.

[2] See N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 222–23, 989 A.2d 829 (2010) (explaining that "Kinship Act, effective January 1, 2002. N.J.S.A.

2005, upon being notified that Irene was homeless, pregnant and likely abusing alcohol and/or drugs, DYFS contacted Irene's then paramour and the father of two of Irene's then three children, Richard Sr. He confirmed that Irene was pregnant and was drinking during her pregnancy; he, however, expressed an inchoate doubt that he was the father of Irene's then-unborn child. By March 2006, DYFS was able to reach Irene and confirm that she was pregnant, homeless and likely abusing prescription medication.

Fleeing because she believed DYFS would take this child also if she remained in New Jersey, Irene went to Florida. Shortly after arriving there, she gave birth to Richard Jr., identifying Richard Sr. as the child's father. Four days after Richard Jr. was born, a New Jersey court ordered that legal and physical custody of Richard Jr. be placed with DYFS and that Irene comply with certain recommendations concerning substance abuse evaluation and treatment. Irene returned to New Jersey with Richard Jr., and DYFS placed the child with Richard Sr.'s parents.[3] That placement came about because Irene insisted that Richard Sr. was the father of Richard Jr., to the point of making the child Richard Sr.'s namesake.

Because Richard Sr. continued to question whether he was the father of Richard Jr., a paternity test was performed. It determined that Richard Jr. was not the natural child of Richard Sr.

---

3B:12A–1 to –7 ... established a new type of legal guardianship that addresses the needs of children and caregivers in long-term kinship relations[, for those] children who cannot safely reside with their parents [but] are in the care of a relative or a family friend who does not wish to adopt the child or children ... as an alternative permanent placement option without the need for termination of parental rights and where adoption is neither feasible nor likely" (internal citations and quotation marks omitted)).

[3] Richard Sr.'s parents already had kinship legal guardianship over two of Irene's three prior children, those who had been fathered by Richard Sr. Irene's remaining child, who was fathered by someone other than defendant or Richard Sr., was placed in a kinship legal guardianship with that child's paternal grandparents.

For that reason, on July 11, 2006, custody of Richard Jr. was moved from Richard Sr.'s parents to the foster family where he remains to date. Two weeks later, at a compliance hearing arising out of an abuse and neglect complaint DYFS had filed earlier, DYFS requested that Richard Sr. "be dismissed from the complaint[,]" noting that the paternity test "indicates that there is zero probability that [Richard Sr.] is the father of [Richard Jr.]" and "ask[ing Irene] to hopefully identify who the father of this child is so that [DYFS] can begin exploring him as well." Responding to a direct inquiry by the trial court, Irene identified defendant by a nickname and his surname, but was unable to state where defendant lived, his age or date of birth, or where defendant worked, stating she had met defendant "just once and that she doesn't have that much information." [4] Given that setting, DYFS asserted that it "cannot search for someone with that little information" and requested that "until [Irene] can give us detailed-any more detail information that [DYFS] be excused from searching for [defendant.]" The trial court ordered as follows:

> The child is to continue in the custody of [DYFS], remain in placement. [DYFS] can search for any additional relatives, family members, search for the named father of the child. [Irene is] to cooperate with [DYFS] in locating that person. Once that person is located he is to submit to the DNA test. If he refuses to submit to a DNA test voluntarily he would have to be named a part defendant so he could be ordered to submit to a DNA test.

The trial court then set the case for "another compliance review date, possibly a permanency hearing[.]"

On August 11, 2006, the trial court conducted another compliance hearing on DYFS's abuse and neglect complaint. At that hearing, Irene again identified defendant as the father, but only

---

[4] Despite the test results excluding Richard Sr. as the father of Richard Jr., Irene nevertheless continued to insist that Richard Sr. had fathered Richard Jr. According to a DYFS case worker's undated report covering the period between May 15, 2006 and July 21, 2006, although Irene was "informed ... of the results of the paternity test[, she] strongly denied the possibility of any one else being the father." The DYFS case worker "explained [to Irene] that the test results were accurate and that the samples had been from [Richard Jr.] and his potential father [Richard Sr.]"

by a nickname and, this time, a misspelled surname. At the conclusion of the evidentiary portion of that hearing, the trial court found that DYFS had proved its abuse and neglect allegations against Irene by "overwhelming evidence" and that Richard Jr. "is considered abused[ and] neglected[.]" It ordered that Richard Jr. remain in the custody of DYFS and that DYFS "will have to search, serve the new—newly named father of the child, have him submit to a DNA test when—when [DYFS] find[s] him." The trial court warned Irene that "unless you cooperate with [DYFS], cooperate with your attorney, [and] are in a position to provide a safe, stable home for the child, [DYFS] will be making an application to terminate your parental rights so that the child can be adopted."

At a follow-up compliance hearing held on October 4, 2006, the trial court inquired of DYFS whether it had had "any contact with the person [previously identified by Irene by nickname] who might be the father of the child." DYFS explained that it had not, noting anecdotally that Irene "has had contact and has been attempting him—to get him into the [DYFS] office and comply with the paternity testing, but [DYFS] ha[s] had no contact with him." It observed that "[w]ith regard to the named father, ... [DYFS] do[es] not have any other information about his current whereabouts, but that [Irene] has had continued contact with him." Irene's counsel interjected, stating that Irene had advised defendant "that he needs to present himself to [DYFS] for DNA testing." Counsel sought to downplay Irene's responsibilities by claiming that "[a]ll she can do is tell him—my understanding is that she had given to [DYFS] as much information as she could[,]" suggesting that "[m]aybe [DYFS] might consider maybe sending a worker to go with my client to where he lives." Although defendant was not yet a party to these proceedings, Irene's counsel also suggested that "if the court wants to maybe issue an order directly to him, that's something [DYFS] might want to explore[.]" Irene herself claimed that she "told DYFS where [defendant] lives" and provided, on the record, defendant's place of employment, shift times, and work telephone number, asserting

she was now sure defendant was the father of Richard Jr. She remarked that when she had asked defendant to submit to the paternity test, he replied: "I need a lawyer for myself[.]" The trial court then ordered that DYFS "search for [defendant]. Once he's located have him submit to a DNA test, give him notice of the next court date. If he doesn't show up on the next court date a warrant can be issued for his arrest if he has been properly served."

Notwithstanding Irene's representations to the court, defendant insists that it was not until December 2006 that Irene advised defendant that he could be Richard Jr.'s father. Within days, defendant submitted to a DNA test and, on December 14, 2006, it revealed that he was the father of Richard Jr. Once it was ascertained that defendant was Richard Jr.'s father, defendant was squarely on the horns of a dilemma: he was married, had four children and was the father of an intact family, yet he was confronted with having fathered a child with someone other than his wife. By his subsequent efforts, defendant tried, understandably, to keep his family intact while also recognizing his responsibility for his out-of-wedlock child. Initially, he harbored the hope that his wife would accept Richard Jr. and raise him as part of their existing family.

As a result, defendant appeared at the next court date—January 17, 2007—accompanied by his wife and daughter, but without counsel. After the abuse and neglect complaint was amended to list defendant as a party and in response to a direct question from the trial court, defendant admitted that he was the father of Richard Jr. Irene also stated that defendant was the father of Richard Jr., but claimed that she did not realize it until after she was informed of the negative results of the paternity test for Richard Sr. The trial court advised defendant that he had "the right to have an attorney." Through an interpreter and again without the benefit of counsel, defendant explained that, because he was already married, he did not presently want custody of the child. He further explained that he needed "to find out who can

look out for the child because I am married and I have four children with my wife." In response to the trial court's questions, defendant offered to pay child support "[a]ccording to my income." He noted that, at present, his wife did not want to take care of this child. Defendant explained:

> Your Honor, I want you to know that I have four children and I have problems in my home with my wife because of this situation because I am—I'm not a young man anymore and my income doesn't allow me to support—I have no space to have the child either unless perhaps I were able to send the child to my country where I will have there people who will look after the child.

After providing his income information, the trial court observed that defendant "can make application for the court to assign an attorney[,]" stating that "[b]efore he leaves we'll take [his written application for counsel and] assign it to the public defender." The trial court ruled:

> As far as this proceeding, the child is to continue in the legal, physical custody of [DYFS]. [Defendant] is not offering himself as a caretaker. He has the right to have counsel. If he wishes to visit, he could sit down with [DYFS], develop a plan for the child. If he has no plan, not offering himself as a caretaker, I don't see what the purpose of visitation would be.

Defendant, still without counsel, did not appear at the next scheduled hearing, which was held on March 14, 2007. He did, however, notify the trial court in advance that he would be absent because he was going to be "out of the country ... attending to a sick relative." The trial court summarily determined that defendant's "non-appearance can be waived since he's not offering himself as a caretaker." At that hearing, DYFS, for the first time, disclosed that its "goal is termination of parental rights." It noted that, although defendant "is attending visitation[,] he's not offering either him or his wife as a resource for this child." In respect of suitable placements for Richard Jr., DYFS did note that it "requested that [defendant] also provide us with any additional relatives as well." Although the trial court determined that defendant "has not been offered services[ by DYFS,]" it excused that failure, reasoning that "[s]ince his position is that he does not wish to be a caretaker, the lack of services as to [defendant] would be reasonable under the circumstances." It ordered that DYFS

file a guardianship complaint by May 16, 2007, when another hearing would be held.

At the May 16, 2007 hearing, defendant, through an interpreter and again not yet represented by counsel, noted that, while he personally was not in a position to take care of Richard Jr., "[t]he wife of a friend of mine ... has made a commitment to take care of him." When asked whether DYFS had "ever sat down with [defendant] to develop a plan for the baby[,]" DYFS responded:

> Judge, I know [DYFS] has spoke[n] with him. He indicated that he was considering the Dominican Republic for this child. That was his plan and I'm not quite sure if this is the wife of his friend [who] lives in the Dominican Republic or I'm not clear as to that but [DYFS] was told that he cannot [be the caretaker] at this time for this child. He is not offering himself as a plan but he would be offering someone in the Dominican Republic.
>
> [W]e'll take names from [defendant] but [DYFS] feels that to send this child to the Dominican Republic would be problematic at best.

Although the appointment of counsel for defendant clearly was discussed during the January 17, 2007 hearing, it had not yet been done. Acknowledging that shortcoming, the trial court ordered that defendant be provided counsel and explained that, while defendant "could sit down with [DYFS and] discuss a plan for the child[, t]he plan of sending the child to live in the Dominican Republic with a family friend does not seem to be appropriate." It then scheduled a hearing on DYFS's guardianship complaint for June 27, 2007, noting that DYFS "can arrange updated psychologicals, bonding evaluations for [Irene] and for [defendant] if necessary."

At the June 27, 2007 hearing, defendant was represented by counsel for the first time. During the colloquy with the trial court, DYFS acknowledged that defendant had provided his sister as "a relative resource that we're looking at[.]" DYFS explained that it had

> looked at the paternal aunt as a resource. We did go out to the home. There are some concerns with regards to the number of people living in the house. There's four adults in the home and it is a one bedroom apartment that has been converted somehow into a two bedroom which is one of my questions was they're renting this. was this a legal conversion or not a legal conversion and then again my other issue

is that according to the resource specialist who went out that the home not only has four adults but it appears quite cluttered as well.

So we have—there has not been a rule out, obviously we need to discuss this with her, discuss the condition of the home and [DYFS] will continue working with her but—and we're going to continue to do that and [DYFS] will have to come to some type of decision but again [DYFS]—even if the home does check out and the background checks are fine, [DYFS] is still going to be looking at the bonding evaluations before any potential movement of this child.

Significantly, DYFS never suggested that assistance might be available to defendant's sister to improve her housing circumstances in order to accommodate Richard Jr. It instead noted that both psychological and bonding evaluations concerning defendant were scheduled to be performed in August 2007.

During that hearing, the trial court asked whether defendant was "interested in being the caretaker for the child[.]" Defendant's counsel replied that "the problem is I believe the wife, she's not in support of being a placement so he's relying on the sister and parents as a resource for this child, Your Honor." DYFS added that, although defendant also had indicated that his brothers could be resources for Richard Jr., "[t]hey indicated that they were not interested in adoption, that's what is on the table at this point." It also explained that DYFS "spoke with his sister who indicated she is interested. She's the one that we are doing the evaluation with at this time." DYFS expressed its preference for Richard Jr.'s current placement because "since pretty much the age of three weeks up until his entire development he's been in this particular home."

Although no psychological or bonding evaluations on Irene, Richard Jr. or defendant had been conducted and no efforts at reunification had been made, the following exchange ensued between the trial court and defendant:

THE COURT: [Counsel for defendant], what's your—your client wants to say something.

[DEFENDANT]: I believe that because one is poor, one's parental rights should not be taken away from one. In every part of the world there's poverty. To raise a child or to have a child you don't necessarily have to have a large physical space. If you don't give the child love and an education, the size of the space you have doesn't—

THE COURT: Mr.—Mr. [defendant], I'm really not interested in your philosophy, okay?  My question is[:] are you in a position to care for your child?  That's my question.

[DEFENDANT]:  I can raise him together with my sister.  I'm married and my wife doesn't want him but my sister can be his mother.

THE COURT:  Can you take the baby home to you and your wife or your family?  The family that you live with?

[DEFENDANT]:  No, not to my wife.

THE COURT:  Well, maybe—

[DEFENDANT]:  My—my sister is a competent person who has raised children—

THE COURT:  No, I'm talking about you, you.  Do you want this child to live with you?

[DEFENDANT]:  I want him to live with my-the child to live with my sister.

THE COURT:  With you.

[DEFENDANT]:  No.

THE COURT:  *Why don't you kick your wife out and take your son home?*  This is your son, you made the baby, you be responsible for him.

[DEFENDANT]:  Correct, I'm responsible.

THE COURT:  Take the baby with you.

[DEFENDANT]:  That's why I'm looking for him because I'm responsible.

THE COURT:  *Take the baby, you made the baby and have your wife leave.*

[DEFENDANT]:  The issue is I have more children with my wife.

THE COURT:  The children live with you?

[DEFENDANT]:  They live with me.

THE COURT:  Why did you have another child with [Irene]?

[DEFENDANT]:  Well there are things that happen in life, accidents.

[(emphasis supplied).]

Immediately following that exchange, the trial court made up its mind, stating that "[accidents] shouldn't happen."  Without the benefit of any proofs, the trial court determined that "defendant is not a viable caretaker for the child.  His position is that his sister is the caretaker.  [DYFS] is willing to explore it but I'm going to set the case down for trial."  Defendant's counsel protested that he "just got the case so it's fair to say I need some information from [DYFS], if there were any prior evaluations."  He added that "I know my client didn't know about this child up until some time in December."  He also explained that he did not "know if they are visiting so even if [they are], I don't know if a bonding

evaluation would be needed in this case, Your Honor, so that's why I'll check the bonding evaluation—" The trial court interrupted, summarily stating that "[i]t doesn't sound like a bonding evaluation or psychological evaluation is necessary." Once the trial court scheduled the trial on the guardianship complaint, DYFS made its goal crystal clear: "[w]e are looking at adoption, not custody transfer, not anything, it's adoption."

Trial on the guardianship complaint was held from October 9 through 12, 2007. DYFS presented the testimony of a DYFS caseworker and a licensed clinical psychologist, Dr. Ernesto Perdomo, who testified that Richard Jr. was bonded to his foster parents and that severing that bond would harm the child. Again through an interpreter, defendant testified that he had not been approached by Irene concerning Richard Jr. until December 2006, that he voluntarily submitted to a DNA test, and that he had appeared at the very next hearing date to express his desire to parent the child, albeit with the assistance of relatives. He also explained that he offered himself as a placement for his son "after [DYFS] rule[d] out [his] sister saying she had a very small apartment." He elaborated, noting that "[t]hen my wife threw me out of the house. At that time I decided that for them to give the child to me and not to my sister since I am his father." He was informed by DYFS that, in order to qualify for placement of his child, he would need "[a]n apartment with two bedrooms[,]" which he secured. He stated that he also was told by DYFS to secure someone to care for the child while he was at work and that, in compliance, he had identified "a person or persons that I trust, ... she has a license to take care of children and she doesn't work, she's all the time at home." Defendant also stated that he would allow his son's relationship with his foster parents to continue "in appreciation with what they have done with him[.]" He was asked directly: "How committed are you to care for your son?" His response was immediate: "A hundred percent." He explained that his marital woes would not affect his rearing Richard Jr. because he and his wife "[we]re already separated." Finally, defendant was asked: "You're fifty[-]six [years old], do

you think you can care for a child who is eighteen months old?" Rejecting the premise on which the question was founded, he stated that parenting has "nothing to do with age. How many [parents are there] who are even older [and] are taking care of children of that age[?]"

After hearing the parties' summations, the trial court issued its judgment. In a written, unpublished decision dated October 19, 2007, the trial court did "not find [defendant]'s testimony regarding offering resources in and around January 2007 as credible." According to the trial court, defendant "was open and non evasive during his testimony, however, he was constantly confused as to dates and when things were occurring during this case. Instead of referring to dates, he would use the terms [']the first time I was in court['] or [']the second time I was in court.[']"[5] On that basis, the trial court discounted defendant's testimony in respect of when he offered alternative placements for his son, and determined that defendant did not offer any alternate placements for his son until August 2007, a conclusion belied by the transcripts of proceedings before the trial court as early as May 16, 2007.

Addressing whether defendant's parental rights to Richard Jr. should be terminated, the trial court referenced the four-prong test codified in *N.J.S.A.* 30:4C–15.1(a). In respect of the first

---

[5] Tellingly, at trial, the trial court expressed a markedly different view of defendant's credibility in relating events to court appearances in lieu of specific dates. Contemporaneous to defendant's testimony, the trial court observed that

it's crystal clear to me that we are confusing the witness so it's not going to be helpful to me if you keep confusing him because he's having and he's trying, I will give him every credit. You know, when I give the—when I have juries and I give them the credibility charge, is the person being evasive? He's not being evasive, he's trying to answer the questions but we're confusing this gentleman.

So it's not going to be helpful to me. I think he's trying to give us honest answers but we're getting confusing. . . . I don't think he really knows the days which is okay. I don't remember dates either. Many people don't— are not going to remember an exact date a year later[,] but we're confusing this gentleman and it's not helping anyone but I—you know he's trying to answer the questions.

prong, the trial court noted that DYFS had "allege[d] that due to 'life circumstances' and by failing to offer himself as a resource for placement of his son [Richard Jr.] until August 2007 that [defendant] endangered the child's safety, health or development." In the trial court's view, defendant "became aware that he was the biological father of [Richard Jr.] no later than December 2006" and "he did not offer himself as a resource until August 2007[,] some nine months later." It concluded that defendant delayed "until he was asked to leave the marital home by his wife[.]" It therefore found that DYFS "ha[d] proven [p]rong (1) by clear and convincing evidence in that due to 'life circumstances' and/or the failure to offer himself as a resource until August 2007, [defendant] endangered the child's safety, health or development." It so found because, in its view, "[t]he child was in foster care from the age of approximately two months and [defendant] did not offer himself as a resource until the child was sixteen months of age."

Focusing on the test's second prong—whether defendant was unwilling or unable to eliminate the harm facing the child, *N.J.S.A.* 30:4C–15.1(a)(2)—the trial court again repeated its refrain: that DYFS had "presented evidence regarding [defendant's] 'life circumstances', his commitment and/or lack thereof to his son [Richard Jr.] and evidence to support that [defendant's] life was in chaos in regard to this second prong." Discarding defendant's proposal to care for his child as "realistic but not probable to occur[,]" the trial court concluded that DYFS "ha[d] proven by clear and convincing evidence [p]rong (2) of the statute in regard to . . . [defendant]."

Turning to the third prong listed in *N.J.S.A.* 30:4C–15.1(a)(3), the trial court ruled as follows:

> [DYFS] also provided visitation to [defendant] even though prior to August 2007 it was not his stated desire to unite with the child. [DYFS] offered and provided this visitation service since at least March 2007, at least 5 months prior to [defendant] offering himself as a resource. [DYFS] also offered paternity testing for [defendant] and also considered relatives as resource placement as provided by [defendant]. [T]he court finds that [DYFS] acted diligently upon these resources referrals once they were received from [defendant]. [Defendant] offered four siblings as resources, one sister and three brothers. Unfortunately, his sister's

home could not meet licensing requirements, one brother indicated he could not take the child in and [DYFS] was unable to make contact with the other two brothers. It was only after [DYFS] exhausted these possibilit[ies] that [defendant] offered himself as a possible placement in August 2007 after he had separated from his wife and family. [DYFS] also offered parenting classes to [defendant], however, the court finds that [DYFS] could have and should have made a better effort to provide that service as the testimony was that [defendant] was referred to parenting classes that could not accommodate his work schedule and [DYFS] must do better in that regard. However, [DYFS] was not given much notice by [defendant] as he only offered himself as a placement in August 2007 and that did not leave [DYFS] much time to find services for him.

Based on that analysis, the trial court found that DYFS "ha[d] proven the third prong of this test by clear and convincing evidence in regard to . . . [defendant]."

Finally, the trial court considered whether "[t]ermination of parental rights will not do more harm than good." *N.J.S.A.* 30:4C–15.1(a)(4). Accepting Dr. Perdomo's opinion that "the child [Richard Jr.] has very minimal emotional attachment to [defendant,]" and that Richard Jr. "has bonded significantly with his foster parents to the point that he sees his foster parents as his psychological parents and as a source of comfort and emotional support[,]" the trial court concluded that DYFS "ha[d] proven the fourth prong by clear and convincing evidence in regard to . . . [defendant]." It therefore entered an order "terminating [both Irene's and defendant's] parental rights, and placing [Richard Jr.] in the guardianship of [DYFS] for all purposes, including adoption."

Defendant appealed, challenging the trial court's findings in respect of each of the prongs of *N.J.S.A.* 30:4C–15.1(a) and, in an unpublished decision, the Appellate Division affirmed the termination of defendant's parental rights. Acknowledging that "DYFS's application to terminate [defendant's] parental rights presents a closer case" than the termination of Irene's parental rights, the Appellate Division declared itself "satisfied that the trial court's decision to terminate [defendant's] parental rights was supported by substantial credible evidence in the record." It

therefore "affirm[ed] substantially for the reasons stated by [the trial court] in [its] written opinion rendered on October 19, 2007." [6]

Defendant's petition for certification was granted. *N.J. Div. of Youth & Family Servs. v. C.M.*, 198 *N.J.* 308, 966 *A.*2d 1075 (2009). The order granting certification further provided that DYFS "shall forthwith establish an appropriate schedule, prepared and overseen by a psychologist and such other counseling professionals as [DYFS] deems necessary, to the end that [defendant] shall have regular and accelerating visitation with [Richard Jr.], during the pendency of this appeal and until the further Order of the Court." Also, leave to appear *amicus curiae* was granted to Legal Services of New Jersey (Legal Services) and to the Association for Children of New Jersey (Association for Children).

## II.

Defendant advances two principal arguments. Initially, he asserts that "the trial [c]ourt err[ed] by ruling that [DYFS] had proved by clear and convincing evidence the four prongs of *N.J.S.A.* 30:4C–15.1[(]a[).]" He also asserts that "the trial [c]ourt err[ed] by relying on [DYFS]'s claim that it proved the four prongs solely based on the defendant's lack of knowledge that he had fathered [Richard Jr.] and subsequently failed to immediately offer himself as the sole caregiver[,] and the [c]ourt[']s finding that [defendant's] marital strife was harmful to [Richard Jr.]."

In contrast, DYFS asserts that it proved all four statutory prongs by clear and convincing evidence. It claims that prong one, *N.J.S.A.* 30:4C–15.1(a)(1), is satisfied whenever a parent withholds nurture and support, thereby rendering the parent guilty of endangering a child left in foster care. It also argues

---

[6] The termination of Irene's parental rights also was affirmed by the Appellate Division. Irene's petition for certification was denied, *N.J. Div. of Youth & Family Servs. v. I.S.*, 198 *N.J.* 311, 966 *A.*2d 1077 (2009). For that reason, no reference has been or will be made to any of the findings concerning Irene.

that prong two, *N.J.S.A.* 30:4C–15.1(a)(2), is satisfied because defendant's delay in assuming responsibility for his child demonstrates a lack of commitment that equates to a finding that defendant is unable or unwilling to eliminate harm to the child. DYFS also asserts, in respect of prong three, *N.J.S.A.* 30:4C–15.1(a)(3), that it had made reasonable efforts to work toward reunification, and, in respect of prong four, *N.J.S.A.* 30:4C–15.1(a)(4), that there was no evidence that terminating defendant's parental rights would do more harm than good, referencing solely that Richard Jr. had been doing well in his foster home.

The law guardian for Richard Jr. largely repeats DYFS's arguments, although the law guardian candidly acknowledges that the post-trial visitations between defendant and his son have placed their relationship "in flux" and that "[b]ecause of this, the position as to [Richard Jr.'s] best interests regarding guardianship may require a different analysis and position than that undertaken in the trial court."

*Amicus* Legal Services attacks the trial court's findings on a number of fronts, forcefully asserting that the trial court improperly found that DYFS had proven the four prongs of *N.J.S.A.* 30:4C–15.1(a) by clear and convincing evidence. Principally, Legal Services claims that the trial court inappropriately relied on defendant's age, gender and work schedule to justify terminating his parental rights, characteristics it asserts are commonplace and, moreover, that "[t]here is no factual or policy support for a finding that any of these facts cause harm to a child."

*Amicus* the Association for Children in the main mirrors the arguments advanced by DYFS and the law guardian for Richard Jr. seeking to sustain the trial court's judgment.

### III.

As a threshold matter, we are guided by the principle that "clearly favors keeping children with their natural parents and resolving care and custody problems within the family." *In re Guardianship of J.C.*, 129 *N.J.* 1, 7–8, 608 *A.*2d 1312 (1992). That

is so because "[p]arents have a constitutionally-protected, fundamental liberty interest in raising their biological children, even if those children have been placed in foster care." *Id.* at 9, 608 *A.*2d 1312 (citation omitted). Consistent with that principle, "the State's *parens patriae* responsibility to protect the welfare of children ... is limited to situations in which the state has demonstrated that the child's parent or custodian is unfit, or that the child has been neglected or harmed." *Id.* at 10, 608 *A.*2d 1312 (citations omitted).

Further, in relevant part, *N.J.S.A.* 30:4C–15 provides that

[w]henever it appears that the best interests of any child under the care and custody of [DYFS] require that he be placed under guardianship ... a petition to terminate the parental rights of the child's parents, setting forth the facts in the case, shall be filed by the division with the Family Part of the Chancery Division of the Superior Court in the county where such child may be at the time of the filing of such petition.

In the circumstances presented here, the standards to gauge a petition seeking the termination of parental rights also are set by statute, establishing a four-prong test:

[DYFS] shall initiate a petition to terminate parental rights on the grounds of the "best interests of the child" pursuant to subsection (c) of section 15 of *P.L.* 1951, *c.* 138 (C. 30:4C–15) if the following standards are met:

(1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) [DYFS] has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[*N.J.S.A.* 30:4C–15.1(a)]

As this Court explained in *New Jersey Division of Youth & Family Services v. P.P.*,

The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests. First, the trial court must consider whether the parent has harmed or is likely to continue to harm the child. Harm, in

this context, involves the endangerment of the child's health and development resulting from the parental relationship. Rather than focusing on a single or isolated harm, the standard may be triggered by an accumulation of harms over time. Second, there must be a showing that the harm continues because the parent is unable or unwilling to overcome or remove it. Included in that inquiry is whether delay in permanency will cause further harm and whether the child has bonded to his or her foster parents to the extent that separation from them would in itself cause serious and enduring emotional or psychological harm to the child. Third, DYFS must make reasonable efforts to provide services to help the parent eliminate the harm and reunite the family, and the court must consider alternatives to termination of parental rights. Even when those criteria are met, *N.J.S.A.* 30:4C–15.1(a)(4) requires a finding that ending the parent-child relationship will not do more harm than good.

[180 *N.J.* 494, 506–07, 852 *A.2d* 1093 (2004) (citations, internal quotation marks and editing marks omitted).]

It bears repeating: "Importantly, those four prongs are not discrete and separate, but relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." *N.J. Div. of Youth & Family Servs. v. G.L.*, 191 *N.J.* 596, 606–07, 926 *A.*2d 320 (2007) (quoting *In re Guardianship of K.H.O.*, 161 *N.J.* 337, 348, 736 *A.*2d 1246 (1999) (internal quotation marks omitted)).

In the seminal case of *New Jersey Division of Youth & Family Services v. A.W.*, 103 *N.J.* 591, 607, 512 *A.*2d 438 (1986), following which the Legislature adopted the standards now set forth in *N.J.S.A.* 30:4C–15.1, this Court emphasized that the primary focus in a termination of parental rights case should be upon harm to the child. We directed that trial courts should "determine whether it is reasonably foreseeable that the parents can cease to inflict harm upon the children entrusted to their care." *Ibid.* Following *A.W.* and the later legislative adoption of its standards as now codified in *N.J.S.A.* 30:4C–15.1, the Court elaborated as follows:

When the child's biological parents resist the termination of their parental rights, the court's function will ordinarily be to decide whether the parents can raise their children without causing them further harm. In most cases proofs will focus on past abuse and neglect and on the likelihood of it continuing. However, the cornerstone of the inquiry is not whether the biological parents are fit but whether they can cease causing their child harm. The analysis of harm entails strict standards to protect the statutory and constitutional rights of the natural parents. The burden falls on the State to demonstrate by clear and convincing evidence that

the natural parent has not cured the initial cause of harm and will continue to cause serious and lasting harm to the child.

[*J.C.*, *supra*, 129 *N.J.* at 10, 608 *A.*2d 1312 (citations omitted).]

Further protection of a parent's constitutional right to rear his or her own child finds expression in the burden of proof required before those rights can be severed. Following the direction of the Supreme Court of the United States in *Santosky v. Kramer*, 455 *U.S.* 745, 747–48, 102 *S.Ct.* 1388, 1391–92, 71 *L.Ed.*2d 599, 603 (1982), this Court determined that "[t]he correct standard [of proof DYFS must meet in order to justify the termination of parental rights] is 'clear and convincing' proof." *A.W., supra,* 103 *N.J.* 591, 612, 512 *A.*2d 438 (1986); *accord G.L., supra*, 191 *N.J.* at 606, 926 *A.*2d 320 (holding that "DYFS bears the burden of proving each of those prongs by clear and convincing evidence" (citation omitted)); *N.J. Div. of Youth & Family Servs. v. M.M.,* 189 *N.J.* 261, 280, 914 *A.*2d 1265 (2007) (concluding that DYFS "bears the burden of proving by clear and convincing evidence that the four statutory criteria are satisfied" (citation omitted)). Also, "when a trial judge applies the statute, he must be cognizant that the considerations involved are extremely fact sensitive and require particularized evidence that address the specific circumstances in the given case." *G.L., supra*, 191 *N.J.* at 606, 926 *A.*2d 320 (citation and internal quotation marks omitted).

█ The clear and convincing evidence standard is not a hollow one, as

[c]lear-and-convincing evidence is that which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the precise facts in issue.

[*In re Seaman*, 133 *N.J.* 67, 74, 627 *A.*2d 106 (1993) (citation, internal quotation and editing marks omitted).]

*See also In re Purrazzella*, 134 *N.J.* 228, 240, 633 *A.*2d 507 (1993) (defining clear and convincing evidence as "evidence that should produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established" (citation and internal quotation marks omitted)).

Viewed through that analytical structure, those four standards or "prongs," measured against a clear and convincing evidence standard of proof, are what must govern our inquiry. In determining whether a parent's parental rights to a child are to be terminated, it is those four standards and their application—and only those four standards—that command our focus.

## A.

According to DYFS, defendant "failed to provide a safe and stable home for [Richard Jr.] . . . for failing to offer himself as a resource in a timely fashion[.]" The trial court found that although defendant

> was not declared the biological father until December 2006, he did not offer himself as a resource until August 2007[,] some nine months later. While this may seem like a short period of time, in this case, it is half of the life of the child [Richard Jr.] The court also finds that [defendant] did not offer himself as a resource until he was asked to leave the marital home by his wife or as [defendant] phrased it on several occasions[:] "I was thrown out of the house." [Defendant], in his testimony, stated that he offered several relatives as resources as early as January 2007. The court has already rejected that testimony and finds it much more likely and does in fact find that he did not offer these relatives until May 2007. Therefore, the court finds that [DYFS] has proven Prong (1) by clear and convincing evidence in that due to "life circumstances" and/or the failure to offer himself as a resource until August 2007, [defendant] endangered the child's safety, health or development. The child was in foster care from the age of two months and [defendant] did not offer himself as a resource until the child was sixteen months of age.

The Appellate Division endorsed that reasoning and corresponding conclusions. Although Richard Jr. obviously was out of harm's way and safely in the care of foster parents while under DYFS's supervision almost from the date of his birth, the Appellate Division concluded that defendant's failure to "step up" and offer himself as the child's caregiver for a period of eight to nine months somehow satisfies *N.J.S.A.* 30:4C–15.1(a)(1): that "[t]he child's safety, health or development has been or will continue to be endangered by the parental relationship[.]" That novel reasoning and the conclusion that flows from it cannot be sustained.

It is well-established that the period of time a child has spent in foster care is not determinative of whether parental

rights to that child should be terminated, as "[t]he protection of parental rights continues when a child is placed in foster care." *K.H.O., supra,* 161 *N.J.* at 347, 736 *A.2d* 1246 (citing *J.C., supra,* 129 *N.J.* at 9, 608 *A.2d* 1312). The inquiry thus is not as circumscribed as the Appellate Division's conclusions would suggest. Instead, "parental fitness is the key to determining the best interests of the child." *Id.* at 348, 736 *A.2d* 1246 (citing *In re Adoption of Children by L.A.S.,* 134 *N.J.* 127, 139, 631 *A.2d* 928 (1993)).

In respect of the first prong of the test for terminating parental rights, *N.J.S.A.* 30:4C–15.1(a)(1), this Court has made clear that "[t]he statute requires that the State demonstrate harm to the child by the parent" and that "[h]arm, in this context, involves the endangerment of the child's health and development *resulting from the parental relationship.*" *K.H.O., supra,* 161 *N.J.* at 348, 736 *A.2d* 1246 (citing *N.J.S.A.* 30:4C–15.1(a)(1)) (emphasis supplied). This Court further has made clear that "the focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development." *Ibid.*

Measured by that well-established yardstick, the assertion that simply because defendant delayed eight months in offering himself as his child's caregiver caused "harm" to a then-sixteen-month-old child is unsustainable.[7] Our child welfare system over-

___

[7] Our dissenting colleagues maintain that, in the circumstances presented, defendant's delay in assuming his parental duties suffices to justify termination of parental rights. We cannot agree with so broad an assertion of "harm" in this case, where more than half of the complained-of period of delay elapsed before defendant was made aware he was the child's father.

Moreover, the authority on which the dissent in large part relies—both from within this state, *post* at 199–200, 996 *A.2d* at 1020–21, and without this state, *post* at 201–02, 996 *A.2d* at 1021–22—arises either in the context of adoptions, a statutory scheme fundamentally different from the precepts that govern the termination of parental rights or in circumstances in which the delay by the father in asserting his parental rights was greatly in excess of the delay presented

flows with instances where children are in foster care for periods far exceeding the time here, yet the parental rights of the natural parents are not terminated solely due to the passage of time. Our child welfare system also is replete with instances where children are placed in foster care for periods far in excess of those at issue here, yet many of them in fact are reunited with their parents. Logic and common sense therefore demand that, in order to justify a termination of parental rights, something more than the delay presented here is required, and the element of simple expediency cannot become the goal sought. That "something more" is plainly absent here.

If, as in *In re Guardianship of D.M.H.*, 161 *N.J.* 365, 736 *A.*2d 1261 (1999), the delay between knowledge of paternity and the filing of a guardianship complaint had been two-and-one-half years, the trial court's reasoning may have been sustainable in this case. However, unlike the absent father in *D.M.H.*—who did nothing for an almost three-year period preceding the filing of a guardianship complaint—defendant became aware of his paternity of Richard Jr. in December 2006; he made his presence known to the court and to DYFS at the first available opportunity, the court hearing in January 2007; he consistently offered alternative place-ments for Richard Jr. with relatives; and, ultimately, he offered himself for that placement in August 2007. Examined impartially, defendant's offer was made all of nine months after it first was ascertained he was the biological father of Richard Jr.; all of eight months after his first court appearance concerning a then-pending abuse and neglect complaint; all of three months after the guard-ianship complaint was filed; all of two months after he was first represented by counsel; and, tellingly, two months *before* the first day of the guardianship trial was held.

When viewed in its proper, fair and reasonable context, it cannot be said that defendant's delay in offering himself to raise

here. In the unique context of this case, those authorities are neither controlling nor persuasive.

his own child could have caused the "harm" necessary to satisfy, by clear and convincing evidence, that "[t]he child's safety, health or development has been or will continue to be endangered by the parental relationship[.]" *N.J.S.A.* 30:4C–15.1(a)(1). Plainly put, defendant neither caused harm nor endangered his son's health or development. Any contrary conclusion is simply wrong and entirely unfounded in this record.

B.

The trial court also determined that the proofs offered by DYFS satisfied the second prong of the termination of parental rights test, *N.J.S.A.* 30:4C–15.1(a)(2), which requires, as a condition precedent to the termination of parental rights, that

> [t]he parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child[.]

The analysis adopted by the trial court in determining that DYFS satisfied this statutory requirement is revealing and, for that reason, is reproduced at length:

> [DYFS] presented evidence regarding [defendant's] "life circumstances", his commitment and/or lack thereof to his son [Richard Jr.] and evidence to support that [defendant's] life was in chaos in regard to this second prong. It must be noted that [defendant] is 56 years old and that the child is 18 months old. While this in and of itself is not a determining factor, it is a factor that the court will take into consideration. It was argued and the court accepts that it would be somewhat more difficult for a 56 year old man to care for an 18 month old infant. Dr. Perdomo [DYFS's expert] also reflected this concern in his testimony and the court accepts that testimony. This is just one part of [defendant's] "life circumstances". [Defendant] knows that he is in need of assistance to care for this [then] 18 month old should the child be returned to his custody. He knows that he needs the help of at least his sister and a caretaker/day care worker. [Defendant] indicated in his testimony that he has already arranged for a "licensed" day care professional. However, [defendant's] job schedule is also difficult in raising a child. He presently works nights, based on his own testimony, [and] often works seven days per week or often works overtime. [Defendant] might also be required to work a second job in order to adequately provide for the child[.] This again would make it quite difficult, arranging day care for two separate job shifts. The court accepts all of the above testimony and also finds that frankly [defendant's] life is in chaos. His life certainly is not stable as his wife has recently asked him to remove himself

from the marital home. His wife could not accept this child born out of wedlock nor could she accept the infidelity. [Defendant] has just recently separated from his wife and it should be noted and it is accepted that he was in a long term marriage. The court also finds that [defendant's] commitment to this child is somewhat questionable. As discussed earlier[,] he did not offer himself as a resource until August 2007 although he knew he was the father of this child since at least December 2006.

The court is not unmindful nor is the court unsympathetic to [defendant's] plight. He was faced with a very difficult situation. He had a child born out of wedlock and his wife could not accept the child or the infidelity. [Defendant] chose to remain with his wife and family rather than to make a plan for a life with [Richard Jr.] or to offer himself or anyone else as a resource for [Richard Jr.]. This is not a criticism of [defendant], admittedly his decision must have been difficult. However, he made his choice and his choice was to attempt to work things out with his wife and family, not to make a plan with [Richard Jr.]. This is reflective of his lack of commitment. Again, [defendant] only offered himself as a resource when he was asked to leave the marital home by his wife in August 2007.

Dr. Perdomo in his testimony opined that to remove [Richard Jr.] from his resource family would cause significant irreversible emotional damage to the child. At the trial, the doctor testified that it is "100% certain that the child would have emotional trauma should that separation occur." The doctor opined that the child would suffer from depression; future relationship problems and that separation would affect his ability to trust and relate to others. Dr. Perdomo did indicate that this damage could be mitigated by [defendant] if he could provide stability and appropriate counseling. However, the doctor opined that he did not believe [defendant] could provide this type of stability due to his "life circumstances" which would be difficult to alter. This has already been discussed in this opinion. Again, the court has already found Dr. Perdomo to be credible and would re-iterate the doctor's credibility. Again, the doctor was open and forthcoming in his testimony, and at one point, he even indicated that [defendant's] proposed plan of having the child live with him with the assistance of his sister and a day care worker was in fact realistic. The court finds that plan to be realistic but not probable to occur.

Therefore, based on all of the above, the court finds that [DYFS] has proven by clear and convincing evidence Prong (2) of the statute in regard to [defendant].

Setting aside the internal contradictions contained in that reasoning, the inescapable fact is that defendant stands condemned to lose his child because of the claimed "chaos" in his life or the even more euphemistic "life circumstances." That is contrary to our established law. Defendant is no different than any other single parent who must juggle the seemingly endless and contradictory demands of work, life and child-rearing. Of course defendant's personal life was not going to be the model of tidiness: he had just been jettisoned from his family home and a long-term marriage

that produced four children, and, at age fifty-six, he was trying valiantly to cope with being the father of an infant.

Yet, DYFS's expert, Dr. Perdomo, based his opinion that defendant's parental rights should be terminated solely on the fact that defendant was undergoing turmoil in his life due to the separation from his wife and children. That opinion, however, did not account for the uncontested fact that, after separating from his wife, defendant made housing arrangements to accommodate his son; that defendant had made responsible child care arrangements for his son; and that, at all times, defendant maintained steady and gainful employment. Unfortunately, both courts below appear to have relied heavily on Dr. Perdomo's opinion of defendant's capacity to parent. Viewed with the critical objectivity required in this context, Dr. Perdomo's repeated references to defendant as a man who lacks a supportive wife as the basis for recommending that the child should not live with defendant[8] appears to reflect obsolete notions of gender roles within families.[9] The presumption that a mother is better able to care for a child has long been abandoned:

----

[8] For example, Dr. Perdomo's written report describes defendant as "already a 56-year old man that works an evening shift and has significant marital problems" and who "has a lot of problems in his family due to this child and *his wife refuses to take care of the child* and asked him to leave the house" (emphasis supplied); that report was admitted into evidence during the termination of parental rights hearing. At that hearing, Dr. Perdomo further testified that defendant was unable to parent Richard Jr. because defendant is "a fifty[-]six year old man who is going to take care of [a] one[-]and[-]a[-]half year[] old son by himself *without the help of his wife and family*" (emphasis supplied). That commentary was a constant leitmotif of Dr. Perdomo's evaluation of defendant.

[9] We cannot shake the nagging and troublesome notion that had defendant been the child's mother—and, hence, known of her tie to the child since before his birth—yet still have delayed in "stepping up," neither DYFS nor any court below would have sought to terminate the mother's parental rights; instead, she would have received all of the many reunification services DYFS has at its disposal. Similar assumptions animate the fundamentally disquieting thought that, had defendant been of a higher socio-economic status, the goal again would have been reunification, and not termination.

Under the Parentage Act the claims of the natural father and the natural mother are entitled to equal weight, *i.e.,* one is not preferred over the other solely because he or she is the father or the mother. *N.J.S.A.* 9:17–40. The applicable rule given these circumstances is clear: the child's best interests determine custody.
[*In re Baby M,* 109 *N.J.* 396, 453, 537 *A.*2d 1227 (1988) (footnote omitted).]

An application of those principles leads inexorably to the conclusion that the objective facts in this case cannot justify terminating defendant's parental rights; instead, those same facts should have formed the basis on which DYFS should have complied with its statutory obligations and assisted defendant in recovering and raising that child. More to the point, this Court has never held that a defendant's almost nine-month hesitation in making a seemingly impossible choice—choosing between his wife and intact family, on the one side, and an unexpected out-of-wedlock child, on the other—can constitute a proper basis for terminating parental rights. And, there is no principled reason to hold that way now.

*K.H.O.* provides the principled rule of law applicable here. It explains that, to satisfy *N.J.S.A.* 30:4C–15.1(a)(2),

[t]he State must show not only that the child's health and development have been and continue to be endangered, but also that the harm is likely to continue because the parent is unable or unwilling to overcome or remove the harm. That inquiry is aimed at determining whether the parent has cured and overcome the initial harm that endangered the health, safety, or welfare of the child, and is able to continue a parental relationship without recurrent harm to the child. Alternatively, under this second criterion, it may be shown that the parent is unable to provide a safe and stable home for the child and that the delay in securing permanency continues or adds to the child's harm.
[*K.H.O., supra,* 161 *N.J.* at 348–49, 736 *A.*2d 1246 (citations omitted).]

*See also N.J. Div. of Youth & Family Servs. v. F.H.,* 389 *N.J.Super.* 576, 617, 914 *A.*2d 318 (App.Div.2007) (same).

In the circumstances presented, it cannot be said that the eight-month delay during which defendant offered other relatives for placement of his son before offering himself as the person to rear his own then sixteen-month-old son somehow became "a harm in and of itself." *N.J. Div. of Youth & Family Servs. v. A.G.,* 344 *N.J.Super.* 418, 434, 782 *A.*2d 458 (App.Div.2001) (citing *J.C., supra,* 129 *N.J.* at 10, 608 *A.*2d 1312). When juxtaposed against the fact that defendant is the child's natural father and that the

only so-called "harm" defendant caused was an at-most eight-month delay itself, the proofs adduced by DYFS were woefully insufficient to prove that defendant was unable or unwilling to eliminate the "harm" to his child. To the contrary, it was undisputed that defendant successfully had raised four other children and was prepared likewise to raise his son, Richard Jr.

### C.

As the trial court correctly noted, "[t]he third prong of the best interest standard requires that the court examine the 'diligent efforts' provided by [DYFS] to help the parent correct and overcome the circumstances that led to the child's out of home placement, and to consider all the alternatives to termination." In its statutory parlance, DYFS must prove, by clear and convincing evidence, that it "has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights[.]" *N.J.S.A.* 30:4C–15.1(a)(3). Stated differently,

> the third element of the best interests standard requires DYFS to undertake diligent efforts to reunite the family. That prong of the standard contemplates efforts that focus on reunification of the parent with the child and assistance to the parent to correct and overcome those circumstances that necessitated the placement of the child into foster care.
>
> [*K.H.O., supra*, 161 *N.J.* at 354, 736 *A.*2d 1246 (citations omitted).]

And, "[t]he statutory definition of 'diligent efforts' is 'reasonable attempts by an agency authorized by the division to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure.'" *D.M.H., supra*, 161 *N.J.* at 386, 736 *A.*2d 1261 (quoting *N.J.S.A.* 30:4C–15.1(c) (footnote omitted)). The Legislature has provided that "[s]uch 'reasonable attempts' at reunification include:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;

(3) informing the parent at appropriate intervals of the child's progress, development and health; and

(4) facilitating appropriate visitation."

[*Id.* at 387, 736 *A.*2d 1261 (quoting *N.J.S.A.* 30:4C–15.1(c)).]

According to the trial court, DYFS did engage in some efforts: it (1) "provided visitation to [defendant] ... since at least March 2007, at least 5 months prior to [defendant] offering himself as a resource[;]"[10] (2) it "offered paternity testing for [defendant;]" and (3) it "considered relatives as resource placement as provided by [defendant]" and that those relatives consisted of "one sister and three brothers." The trial court noted that DYFS "also offered parenting classes to [defendant]," but found that DYFS "could have and should have made a better effort to provide that service as the testimony was that [defendant] was referred to parenting classes that could not accommodate his work schedule[.]" Although the trial court concluded that DYFS "must do better in that regard[,]" it nonetheless concluded that DYFS had "fully explored all relatives that were named as potential caretakers" and that, in any event, "[t]here are no alternatives [to] terminating parental rights in this matter." Noting that Richard Jr. "has resided with his resource family for all but approximately two months of his life[,]" it reasoned that "[h]is age and that placement and the willingness of the resource family to adopt makes adoption feasible and likely in this case." It therefore found that DYFS "has proven the third prong of this test by clear and convincing evidence in regard to [defendant]."

That conclusion is strikingly untethered to any record evidence in this case, to any logical construct or to any principled rule of law. What the evidence of record in this matter conclusively demonstrates is that it was DYFS that failed in its obligations: it never "consult[ed] and cooperat[ed] with [defendant] in developing a plan for appropriate services," as required by *N.J.S.A.* 30:4C–15.1(c)(1), and it never "provid[ed] services that [it] agreed

---

[10] That visitation consisted of all of one hour per week, at the DYFS office, supervised by a DYFS case worker.

upon[ with defendant] in order to further the goal of family reunification[,]" as required by *N.J.S.A.* 30:4C–15.1(c)(2). The only so-called "services" DYFS "offered" defendant were inconveniently scheduled and utterly irrelevant *parenting* classes, this for a fifty-six year old man who already successfully had reared four children of his own. Additionally, there is no record proof that DYFS engaged in any efforts to "inform[ defendant] at appropriate intervals of the child's progress, development and health[,]" as required by *N.J.S.A.* 30:4C–15.1(c)(3). Finally, nothing in this record shows that DYFS ever even attempted to "facilitat[e] appropriate visitation" between defendant and his child, as mandated by *N.J.S.A.* 30:4C–15.1(c)(4).

In fact, following the delay caused by confirming Richard Jr.'s paternity—none of which is attributable to defendant—DYFS further delayed in arranging the paltry one-hour-per-week-supervised visitation it unilaterally allowed between defendant and his child, and then only after more than three months had elapsed from the time defendant was identified as Richard Jr.'s father. That delay and those limitations stand in stark contrast with DYFS's own regulations. For example, *N.J.A.C.* 10:122D–1.14(a)(1) specifically requires that "[t]he first visit between the child and parent shall be scheduled to occur as soon as possible, within five working days of the date of initial placement[.]" In a case such as this, where the parent is identified and located after the initial placement of the child, there is no viable reason a schedule of reasonable visitation was not established immediately or within a very short period of time.

DYFS instead limited defendant's visits with his son, both in respect of frequency and time, and in respect of location and supervision. In so doing, DYFS violated its own regulations on the subject. As to the frequency and time of the visits, DYFS's regulations provide for frequent visitation to aid in the relationship between parent and child. Those regulations acknowledge that "[v]isits that are frequent and of long duration are beneficial for most children placed in out-of-home placement and facilitate

movement toward achieving a case goal that establishes perma-
nency" and that "for most children in out-of-home placement, the
goal is to hold a visit every week for a period as long in duration
as possible." *N.J.A.C.* 10:122D–1.1(b). Rebutting DYFS's asser-
tions in this case, its own regulations plainly state that "[s]pecial
consideration shall be given to the need for pre-school children to
have frequent visits since their sense of time is different than that
for older children or adults[.]" *N.J.A.C.* 10:122D–1.14(a)(3).

The standard for whether visits should be supervised is also set
forth in DYFS's own regulations. They unequivocally provide
that "[u]nless [DYFS] or the Superior Court, Chancery Division,
Family Part finds a need for supervision, visits shall be unsuper-
vised." *N.J.A.C.* 10:122D–1.10(b). The regulations also require
that "[i]f visits will be supervised, the plan shall contain a state-
ment of the reason supervision is required." *N.J.A.C.* 10:122D–
1.10(c). DYFS provided no reason to restrict defendant's visits
with his son to supervised ones, and the record reveals none.

Moreover, as early as February 2, 2009, in granting certification
in this case, this Court recognized the inequity in the visitation
schedule DYFS afforded defendant. We specifically ordered that
DYFS "shall forthwith establish an appropriate schedule, pre-
pared and overseen by a psychologist and such other professionals
as [DYFS] deems necessary, to the end that [defendant] shall have
regular and accelerating visitation with [Richard Jr.], during the
pendency of this appeal and until further Order of the Court." At
oral argument held on September 30, 2009—more than seven
months after that Order was entered—DYFS admitted that it had
taken *no* substantive steps to comply with that Order or to
increase defendant's visitation with his child. That conduct cannot
be countenanced.[11]

---

[11] During argument in this appeal, counsel for defendant was asked to provide
the reports of the psychologist ordered by the Court to supervise what was
ordered as defendant's "regular and accelerating visitation with [Richard Jr.],
during the pendency of this appeal and until the further Order of the Court."
Those reports disclose that the seemingly uncomplicated selection of a psycholo-

Before this Court intervened, defendant was restricted to seeing his child for only one hour weekly, in the DYFS office and supervised by a DYFS case worker. Even after this Court intervened and until the matter was raised at argument, that schedule did not change, despite the fact that no allegations of abuse or neglect, or that he otherwise was an unfit parent, ever were levied against defendant. Defendant, having raised four children already, should have been afforded a meaningful opportunity to cultivate a relationship with his infant son. Given the strictures imposed by DYFS, he was not. Indeed, with such limited contacts, no parent could reasonably be expected to develop a relationship with his child. More pointedly, in those circumstances, any assertion that DYFS proved by clear and convincing evidence that it "made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights[,]" as provided by *N.J.S.A.* 30:4C–15.1(a)(3), is plainly unsubstantiated in this record.[12]

## D.

■ Finally, the fourth prong of the test for terminating parental rights, *N.J.S.A.* 30:4C–15.1(a)(4), requires that DYFS

---

gist to supervise the visitations ordered on February 2, 2009 in fact was not made until June 15, 2009, more than four months later. The reports explain that, even after that selection was made, each of the visits continued to be supervised, but now in the psychologist's office. They also disclose that the psychologist did not recommend an increase in defendant's visitation with his son until September 25, 2009, more than seven months after the increase was ordered and that unsupervised visitations started only because the psychologist was unaware of them. Since late September 2009, defendant has been allowed a three-hour per weekend unsupervised visitation with his son in addition to the previously set one-hour per week supervised visit. Although the Court ordered "regular and *accelerating* visitation[,]" no meaningful change in the visitation schedule has been made since September 2009.

[12] Again, a primary example of DYFS's failure to satisfy this requirement is the reason DYFS proffered for its rejection of defendant's sister as an alternative placement for Richard Jr. *See supra* at 157–58, 996 A.2d at 993–94.

prove by clear and convincing evidence that "[t]ermination of parental rights will not do more harm than good." We have explained that " '[t]he question to be addressed under that prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from permanent disruption of her relationship with her foster parents.' " *In re Guardianship of J.N.H.*, 172 *N.J.* 440, 478, 799 *A.*2d 518 (2002) (quoting *K.H.O.*, *supra*, 161 *N.J.* at 355, 736 *A.*2d 1246). We further have explained that "[t]o determine whether the comparative harm is proscribed by the fourth prong in a case involving a child in foster care, . . . the court must inquire into the child's relationship both with [its] biological parents and [its] foster parents." *K.H.O.*, *supra*, 161 *N.J.* at 355, 736 *A.*2d 1246. We have reiterated that " '[w]eighing the potential harm that terminating [the child's] relationship with [its parent] against that which might come from removing [the child] from [the] foster home is painfully difficult, but it is a decision that necessarily requires expert inquiry specifically directed to the strength of each relationship.' " *Ibid.* (quoting *J.C.*, *supra*, 129 *N.J.* at 25, 608 *A.*2d 1312).

In lieu of squarely addressing the statutory inquiry of whether "[t]ermination of parental rights will not do more harm than good[,]" the trial court approached that question backwards; using a double-negative, it stated instead that "it cannot be said that the harm resulting from the termination of [defendant's] parental rights will not be outweighed by the resulting good." It noted that

Dr. Perdomo conducted bonding evaluations between [defendant] and the child and then a separate evaluation regarding the resource family and the child. The court has already found Dr. Perdomo to be credible in this matter and the court accepts his opinion that the child [Richard Jr.] has very minimal emotional attachment to [defendant]. That is due to the fact that [defendant] has only been able to see [Richard Jr.] for approximately one hour per week for the past few months and the relationship is mostly a relationship between the child and someone he knows and plays with. [Defendant] also testified that he knows [Richard Jr.] lives next door to his biological half[-]brother and half[-]sister .. and that he enjoys a frequent relationship with them.

> Dr. Perdomo also opined that [Richard Jr.] has bonded significantly with his foster parents to the point that he sees his foster parents as his psychological parents and as a source of comfort and emotional support. The doctor also testified that a separation from those foster parents would certainly result in significant trauma to the child that would be irreparable. The doctor did concede that the trauma could be mitigated but that it would be irreparable. Dr. Perdomo also opined that the child "100%" would have emotional trauma if separated from his resource family. The court finds Dr. Perdomo to be credible.

It summed up as follows: "Therefore, the court finds that [DYFS] has proven the fourth prong by clear and convincing evidence in regard to [defendant]."

That backwards approach must be rejected. In this case, no expert was needed to establish the common sense notion that this child will be more bonded with his foster parents than with defendant. There are one hundred sixty-eight hours in a week. Of these—and until DYFS was reminded during argument of its court-ordered obligation—this child spent one hundred sixty-seven of them with his foster parents and only one hour with his biological parent, or less than one-half of one percent of the time. Is it surprising, then, that, at that time, this child was more bonded with the foster parents? Of course, had DYFS satisfied its statutory obligations in a meaningful manner and engaged in substantive reconciliation efforts on behalf of defendant and his son, those hours would not have been so lopsided and the resulting expert opinions perforce would have been different. In the distinct circumstances presented here, DYFS's inadequate visitation plans for defendant, standing alone, should have caused the rejection of any application seeking the termination of defendant's parental rights.

### E.

The trial court condemned defendant because he "was compelled to make a difficult decision in this matter. He decided to remain with his wife and family and not offer himself as a resource for [Richard Jr.] until August 2007 when the child was 16 months old and had been in foster care for all but two months." Because defendant somehow made the "wrong" choice, he was to be denied

his child, a child defendant appears more than capable, willing and able to rear. That result runs contrary to the entire legislative and jurisprudential scheme developed to handle this most sensitive of topics: the termination of a parent's rights to his or her natural child.

Based on the record presented, we reach legal conclusions that differ from those of the courts below. *See In re Petition for Referendum on Trenton Ordinance 09–02*, 201 *N.J.* 349, 358, 990 *A.*2d 1109 (2010) (holding that "we owe no deference to the trial court's legal conclusions" (citing *Manalapan Realty Realty v. Twp. Comm. of Manalapan*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995))). We conclude that defendant did not endanger his child's safety, health or development; that defendant was willing and able to provide a safe and stable home for his child; that DYFS woefully failed to make reasonable efforts to provide services to help defendant correct the circumstances that led to his child's placement outside the home; that the trial court never considered, in any substantive manner, alternatives to termination of parental rights; and that there is no basis in this record to conclude that termination of defendant's parental rights to his child will not do more harm than good. We therefore conclude that the trial court "went so wide of the mark that a mistake must have been made" thereby allowing this Court to dispense with the deference traditionally afforded to a trial court's decision to terminate parental rights. *M.M., supra,* 189 *N.J.* at 278–79, 914 *A.*2d 1265. We also conclude that, in this unique setting, severing this parent's ties to his son constituted a gross and unwarranted abuse of the State's extraordinary power over its citizens. For those reasons, we conclude that a judgment terminating defendant's parental rights cannot be sustained on this record.

## IV.

The judgment of the Appellate Division is reversed, the judgment of the trial court terminating defendant's parental rights is vacated, and the case is remanded to the trial court for the

immediate development and implementation of a reasonable, realistic and meaningful reunification plan entered into in good faith. Jurisdiction is not retained.

Justice LaVECCHIA, dissenting.

As a result of the Court's decision today, a four-year-old child will be torn from the arms of the only family he has ever known and placed in the custody of his biological father, a fifty-eight-year-old man who fathered the child during an extra-marital affair and who was unwilling to assume parental responsibilities until more than sixteen months after the child's birth. In the father's absence, the child bonded with foster parents with whom he has lived in a nurturing and loving home since he was three months old. In my estimation, no system of justice which purports to have as its polestar the best interests of the child can tolerate the outcome of today's majority opinion.

The majority's focus is all about defendant and his interests. Conspicuously absent is any real discussion of the best interests of the four-year-old child who provides the beating heart at the center of this controversy. Respectfully, I must dissent in this matter. The family court's decision to terminate the father's parental rights was based on the best interests of the child and is supported by sufficient credible evidence in the record. The father's delay in accepting the child into his life was a form of abandonment that led to the child's attachment to a new family. The child was in need of a permanent home with parents willing to offer sustenance and love. By the time the father, cast from his own marital home, was willing to parent the child, a point of no return had been passed in the biological clock of this child. By then, the father's abdication of his parental responsibilities had caused harm to the child, the child had formed a permanent relationship with his foster parents, and the termination of the father's parental rights would not cause more harm than good.

## I.

## A.

It is well-established that a trial court's decision to terminate parental rights is subject to a deferential standard of review. *See N.J. Div. of Youth & Family Servs. v. M.M.*, 189 *N.J.* 261, 278–79, 914 *A.*2d 1265 (2007). An appellate court must defer to the trial court's factual findings so long as they are supported by adequate, substantial, and credible evidence in the record. *See, e.g., N.J. Div. of Youth & Family Servs. v. G.L.*, 191 *N.J.* 596, 605, 926 *A.*2d 320 (2007). Particular deference is owed to credibility determinations. *M.M., supra,* 189 *N.J.* at 279, 914 *A.*2d 1265. Even where the dispute is over an "alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom," *ibid.* (internal quotation marks and citation omitted), the trial court's findings will be accorded deference unless it is determined that the court "went so wide of the mark that a mistake must have been made." *Ibid.* The majority fails to apply that deferential standard of review, instead reaching its own conclusions that are not only unsupported by, but in stark contrast to, the actual evidence before the trial court. For that reason, it is necessary to present a faithful view of the record.

## B.

As the majority notes, the Division of Youth & Family Services (the Division) has had physical and legal custody of Richard Jr. almost immediately from his birth on April 3, 2006, due to the housing instability and incapacity of the infant's mother, Irene, from drug and alcohol abuse. The child experienced early on some health issues (tremors and seizures) suggestive of withdrawal attributable to prenatal exposure to drugs and/or alcohol ingestion.

Defendant was a married man, father of four children, when he had the affair with Irene that produced Richard Jr. After the affair ceased, defendant did not initiate any continued connection

with Irene, or with the son to whom she gave birth. Irene had taken up with another man. Initially she claimed that he, Richard Sr., was the infant's father and she named the child after him. Paternity testing revealed, however, that Richard Sr. was not the biological father. Several months later, after the court had issued an order requiring DNA testing and after Irene confronted defendant's wife with the boy's existence, defendant finally submitted to a State-required paternity test that established him as the father of Richard Jr.[1] By then the child already was eight months old.

Defendant thereafter refused to offer himself as a caretaker for the child for almost nine months from the time that he became certain that he was the child's biological father. His position regarding care for the child is revealed through a series of hearings conducted in the abuse and neglect action initiated in 2006 concerning Richard Jr. during which defendant was asked repeatedly whether he wanted to take and care for the child. At the January 17, 2007, hearing date at which defendant first appeared he categorically said that he would not take the child. His position was driven apparently by the marital turmoil that had erupted in his life. His wife, with whom he was living, would not take in the infant.

During that hearing the following colloquy took place:

THE COURT: Do you wish to have custody of that baby?

[Defendant]: Not for the time being.

THE COURT: When would you like to have custody, when he's twenty one?

---

[1] Despite the majority's repeated assertion that defendant had no reason to suspect that he was Richard Jr.'s father until December 2006, the record reflects that as early as July 26, 2006, at an abuse and neglect hearing, Irene provided the court and the Division with defendant's name and stated that she had talked to him about submitting to a DNA test. When the proceeding was continued on August 11, 2006, she again identified defendant as "the father" and provided defendant's brother's name and address because she did not know defendant's address. Thereafter, at the October 4, 2006, hearing, Irene provided home and work telephone numbers for defendant, and maintained that she had been in contact with him about submitting to DNA testing. Nonetheless, defendant did not submit to the paternity test until December 2006, shortly after Irene confronted defendant's wife.

[Defendant]: No.

THE COURT: What's going to happen with the baby?

[Defendant]: I have to find out who can look for the child because I am married and I have four children with my wife.

THE COURT: You can't take care of the baby.

[Defendant]: No, not right now.

THE COURT: Do you pay child support? To this baby.

[Defendant]: No because I was waiting for the proof, paternity proof.

THE COURT: Well there's proof now that you're the father of the child. Will you—can you pay child support?

[Defendant]: According to my income.

THE COURT: [Defendant] is not offering himself as a caretaker, [Deputy Attorney General].

[Deputy Attorney General (DAG)]: Judge just that we did a background check on his family, his wife, and we know he lives with his children. There was no concerns with regards to his family. He had indicated to the Division that his plan for the child was dependent on his wife so I guess I—the Division is to assume at this point that his wife is not interested in assisting him to care for this child, to be clear.

THE COURT: You live with your wife?

[Defendant]: Yes.

THE COURT: Does she want to take care of the baby?

[Defendant]: No.

[DAG]: There we are. So, Your Honor, at this point although everything would be fine, obviously that is not a placement option. . . .

With regards to him not being a plan, I can't see him being referred for a psychological evaluation at this time if he is not offering himself as a caretaker so the Division will not be referring him to an evaluation.

. . . .

THE COURT: [Defendant], anything you want to tell me about yourself?

[Defendant]: Your Honor, I want you to know that I have four children and I have problems in my home with my wife because of this situation because I am—I'm not a young man anymore and my income doesn't allow me to support—I have no space to have the child either unless perhaps I were able to send the child to my country where I will have there people who will look after the child.

THE COURT: Do you wish to have an attorney?

[Defendant]: Well, yes.

. . . .

THE COURT: . . . . [T]he child is to continue in the legal, physical custody of the Division. [Defendant] is not offering himself as a caretaker. He has the right to have counsel. If he wishes to visit, he could sit down with the Division, develop

a plan for the child. If he has no plan, not offering himself as a caretaker, I don't see what the purpose of visitation would be.

Although it is not expressly discussed further on the record, defendant and the Division established a schedule for supervised visits with the child. The next hearing on March 14, 2007, was conducted in defendant's absence.[2] At that hearing the Division informed the court that the permanency plan for Richard Jr. was to terminate parental rights. Irene was reported to have experienced a drug relapse and continued housing instability. The Law Guardian expressed support for the plan for Richard Jr. and reported that the child was thriving in his foster home.[3] The court instructed the Division to file its guardianship complaint by May 16, 2007, and rescheduled the permanency hearing to that date.

At the May 16, 2007, hearing, much of the proceeding was taken up with discussion of Irene's admitted drug use, her desire to be placed in another rehabilitation program and not lose rights to Richard Jr., and about the possibility that she might be pregnant again. Defendant also was present. He again was asked by the court if he was in a position to assume caring for the child. He answered again that he could not. Instead, he offered that an unidentified "wife of a friend" could take care of the child. According to the DAG, defendant also had suggested sending the child to the Dominican Republic where he claimed to have "people" who would care for the child. The latter suggestion was not deemed appropriate by the Division and was rejected by the court.

---

[2] The DAG reported that defendant was out of the country attending to a sick relative. The court deemed his appearance waived in light of the fact that he was not offering himself as a caretaker. During the hearing, the Division reported that defendant had been attending scheduled weekly visits with Richard Jr.; however, it was reported that he still was not offering himself or his wife as a possible caretaker.

[3] When he was three months old, the Division placed Richard Jr. in the home of a married couple who were Irene's family friends. They have cared for the child ever since and, as the DAG informed the court on March 14, 2007, they are willing to provide a permanent, stable home for him.

Nonetheless, the court instructed the Division to have further discussion with defendant to learn more about his proposed plan for the child, and continued the matter.

At the next hearing in June 2007, the Division reported that defendant had advanced alternative placements for the child, none of which included offering to care for the child himself. When defendant disputed that the Division had contacted the family members whom he had said would care for Richard Jr., the matter was adjourned again.

Thereafter, in the guardianship action conducted before a different judge, Division representative William Larrinaga testified about the Division's efforts during July 2007 to reach and evaluate the four relative resources that defendant provided. One brother unequivocally stated that he had no interest in taking the child. As for defendant's two other brothers, Larrinaga telephoned them in July 2007 but was unable to establish contact. The fourth relative resource that defendant had provided was his sister, who informed the Division that she was willing to care for the child. According to Larrinaga, Division representatives visited the sister's home and determined that the one bedroom apartment, in which four adults were living, was insufficient for placement standards. However, the Division offered to explore alternative housing for her. It was at that point—when the Division informed defendant of the problems with his sister's home—that defendant finally offered himself as caretaker for his child and informed the Division that he would be getting his own apartment.[4] By then the child was sixteen months old.

---

[4] Larrinaga testified that because defendant had offered himself as a resource, the Division discontinued its efforts in working with defendant's sister as a placement option. It was also around that time that defendant had separated from his wife and moved out of their marital home. Defendant's plan for child care entailed the following. A friend, who was a licensed day-care professional, was to take care of the child while defendant worked at night and defendant proposed to care for the child himself during the day. He asserted that his problems with his wife would not affect his ability to care for the child because he and his wife were separated. Defendant also asserted that his current salary

At the guardianship trial conducted on October 9, 11, and 12, 2007, the Division presented, in addition to Larrinaga's testimony, expert testimony from Dr. Ernesto Perdomo, a licensed clinical psychologist who had conducted psychological and bonding evaluations. Dr. Perdomo's psychological testing of defendant revealed that he was within normal psychological parameters, despite some narcissistic tendencies. Dr. Perdomo also discovered that defendant had problems and stress originating within his family as a result of his infidelity. According to Dr. Perdomo, those circumstances created for defendant a significant amount of tension in his life that, due to his age (fifty-six), the young age of the child, and defendant's work hours, would make his raising the child on his own difficult. Dr. Perdomo's assessment of defendant and his situation was realistic. He opined simply and practically that defendant would require help from his extended family to ensure stability and to provide for the needs of this very young child.

In respect of his bonding evaluation of defendant and Richard Jr., Dr. Perdomo described the relationship as minimal. The child was able to separate from defendant without problem. The child also was restless during the evaluation, a characteristic not present during the bonding evaluation with the foster parents. Dr. Perdomo explained that bonding happens very early when a child is between six months and two years old. Dr. Perdomo found the connection between Richard Jr. and his foster parents to be palpable.[5] When the foster parents were asked to leave, Richard Jr. would run after them and cry, indicating the presence of a strong bonding attachment. Dr. Perdomo concluded that there was substantial psychological evidence to indicate that the child would derive maximum psychological benefit by staying with his foster

---

was sufficient to cover his new living arrangements and the cost of caring for the child. Larrinaga expressed the Division's concerns about the stability of the plan proposed by defendant and his ability to sustain them financially and otherwise.

[5] The foster parents, who have been married several years and have one child of their own, want to adopt Richard Jr.

parents because of the duration of the bonding between Richard Jr. and his foster parents, and the importance of its timing in the child's life. Calling the foster parents the "psychological parents" of the child, Dr. Perdomo said he was "one hundred percent certain" that Richard Jr. would suffer emotional trauma, and that his ability to trust would be damaged, if he now were to be separated from his foster parents.

Dr. Perdomo acknowledged the psychological trauma to Richard Jr. could theoretically be mitigated, but that such mitigation would depend on the degree of stability the child would have in a changed life circumstance. He specifically stated that, if the child was provided a very stable and permanent home, the trauma from the separation from his foster parents could be mitigated. Dr. Perdomo opined, however, that defendant would not be able to provide the stability required to mitigate the psychological trauma to Richard Jr. due to the self-professed turmoil existing in defendant's life from becoming separated from his wife and the four children they had raised together.

In the opinion issued by the trial court, dated October 19, 2007, the court began by making several basic factual findings, starting first with issues relating to the timing and sequence of events. The court found that defendant "became certain" that he was the biological father of the child on or about December 14, 2006, and, further, that he made his first appearance in court on January 17, 2007. Second, addressing defendant's claim that he offered relatives as a resource for the child back in January 2007, and that the Division did little to contact those resources, the court explained that it did not credit defendant's testimony regarding those claims.[6] The court relied on the testimony of Division representative Larrinaga, who reported that, to his knowledge, defendant had not named anyone as a resource until approximately May

---

[6] Although defendant was open and non-evasive during his testimony, the court found that he was "confused as to dates," often using the terms "the first time I was in court" or "the second time I was in court" instead of actual dates.

2007, when he provided the Division with the names of his three brothers and one sister. The court found it relevant that a court order dated May 16, 2007, indicated that defendant was to discuss his plan for the child with the Division some time after that date and, further, that the evidence revealed that the Division attempted to contact the named resources during July 2007. Thus, based on the totality of that information from the record, the court "f[ound] credible the testimony in evidence of the Division that [defendant] did not provide alternative resources for placement until sometime in May or June 2007." And, third, the court further found that defendant did not offer himself as a placement for the child until sometime in August 2007.

Turning to the uncontroverted testimony of the only expert witness in the case, the court found Dr. Perdomo to be "extremely credible." The court found particularly noteworthy his opinion that defendant's "overall ability to provide for an infant child alone is limited due to his life circumstances and separation from his wife and family and [that] he will certainly need the help of his extended family to provide a stable home environment for his infant son." The expert's testimony thereafter was used in the court's analysis of the four prongs of the best-interests-of-the-child test set forth in *N.J.S.A.* 30:4C–15.1(a).

In respect of the first prong that requires a finding that defendant endangered the child's "safety, health or development," the court found such harm to have been proven due to defendant's delay in offering himself as a resource to care for the child. Defendant had knowledge that he was the biological father of the child no later than December 2006, but did not offer himself as a resource to care for his child until August 2007, approximately nine months later. As explained by the court, although that may seem like a short period of time, in this case it was half of the life of the child and ought to be viewed from that perspective. The court noted that the child had been in foster care since he was two months old, was moved to his present foster home at age three months, and that at the time of the trial court's decision was

eighteen months old, having lived for the previous fifteen months with the resource family that wanted to adopt him. The court again rejected defendant's claim that he offered several resources as early as January 2007, finding "it much more likely ... that he did not offer these relatives until May 2007." The court added that defendant "did not offer himself as a resource until he was asked to leave the marital home by his wife or as [defendant] phrased it on several occasions 'I was thrown out of the house.' " The court concluded that the Division had proved by clear and convincing evidence that prong one of the best-interests test was met due to what the court called defendant's " 'life circumstances' and/or the failure to offer himself as a resource until August 2007," thereby endangering the child's safety, health, or development.

The court also found that the Division established prong two of the test. That required a finding that defendant was unwilling or unable to eliminate the harm or to provide a safe and stable home for the child. The court focused on the harmful impact from defendant's delay in coming into Richard Jr.'s life and not offering to act as a care-giving parent to his own son until August 2007, when the child was already sixteen months old. The court's findings on prong two emphasized Dr. Perdomo's testimony, which revealed that removing the child from his foster family would cause significant and enduring emotional damage to the child, and his "100% certain[ty] that the child would have emotional trauma should that separation occur." The court recognized that Dr. Perdomo indicated that the damage could be mitigated by defendant if he could provide stability and counseling, however, the court agreed with the expert's assessment that it was not realistic that defendant could provide the type of stability necessary to avoid such harm due to the turmoil in his life.[7]

---

[7] Regarding the aspects of defendant's life that would affect his ability to provide a safe and stable home for Richard Jr., the court noted, as factors to be taken into consideration, defendant's age at the time (fifty-six) and that of the child (eighteen months). The court stated that defendant understood that he

With regard to prong three, the court found that the Division had made reasonable efforts to provide services to help defendant. The Division provided defendant with visitation services since at least March 2007, offered paternity testing for defendant, and considered defendant's relatives as a resource placement. The court found that the Division acted diligently upon the resource referrals and fully explored all relatives who were named as potential caretakers.

Addressing prong four, the court concluded that terminating defendant's parental rights would not do more harm than good. Dr. Perdomo had testified that the child had minimal emotional attachment to defendant and that he had bonded significantly with his foster parents to the point that he sees them as his psychological parents. The court noted that the child currently lives next door to his biological half brother and half sister (two of Irene's other children) and that he enjoys a relationship with them. The court also acknowledged Dr. Perdomo's certainty that the child would have emotional trauma if separated from his foster family. Based on that evidence, the court found that the Division had proven the fourth prong by clear and convincing evidence.

The court's opinion concluded by acknowledging that defendant had been able to parent children without problems in the past, that he had no criminal background or reports of abuse, that he was gainfully employed, that he had arranged for day-care services for the child, and that he had made efforts to unite with him. That said, the court emphasized that defendant chose, for a significant period of time, to remain with his wife who did not want this child. He did not offer himself as a resource until

---

needed the help of his family and a day-care worker to take care of the child and that defendant testified to having arranged for a licensed day-care professional. The court further observed that defendant's work schedule made child rearing difficult because he worked nights and often overtime and, the court added, he might be required to work a second job in order to adequately provide for the child. In considering the sum of these circumstances, the court expressed a lack of confidence in defendant's ability to make his plan work because "frankly [defendant]'s life is in chaos."

August 2007, after he had been expelled from the marital home, after his sister was being asked to move from her apartment if she wished to be considered as a placement for Richard Jr., and after Richard Jr. turned sixteen months old. At that point in time, viewed from the child's perspective, Richard Jr. had lived for all but his first three months of life in his foster home with his foster family as the only family he had ever known. Based on the totality of those circumstances, the court held that the Division proved by clear and convincing evidence that termination of parental rights was proper so that Richard Jr. could be adopted by his foster parents.

On appeal, the Appellate Division affirmed the judgment terminating parental rights substantially based on the findings and conclusions set forth in the trial court's opinion.

## II.

### A.

A judicial order that terminates parental rights "permanently severs the relationship between children and their biological parents." *N.J. Div. of Youth & Family Servs. v. P.P.*, 180 *N.J.* 494, 505, 852 *A.*2d 1093 (2004). Few actions taken by the State are as severe. *See N.J. Div. of Youth & Family Servs. v. A.W.*, 103 *N.J.* 591, 600, 512 *A.*2d 438 (1986) (citation omitted) (recognizing harsh and irreversible nature of parental-rights terminations). Yet, despite the respect given to the fundamental nature of parental rights, such rights "are not absolute. The constitutional protection surrounding family rights is tempered by the State's *parens patriae* responsibility to protect the welfare of children." *In re Guardianship of K.H.O.*, 161 *N.J.* 337, 347, 736 *A.*2d 1246 (1999) (citing *In re Guardianship of J.C.*, 129 *N.J.* 1, 10, 608 *A.*2d 1312 (1992)). In this matter the Court is asked to address the State's parens patriae concern for the best interests of a child who from birth was not received into a parent-child relationship with his biological father. The Division asserts that the father's ongoing

reluctance, even when asked, to himself assume parenting responsibility for the child caused further delay in the establishment of a parenting relationship with the child during the first eighteen months of the child's life. The dispute is over whether such circumstances can support the termination of parental rights.

The best-interests-of-the-child test governs in an action to terminate parental rights. Codified at *N.J.S.A.* 30:4C–15.1(a), the best-interests test provides that the Division shall petition to terminate parental rights when the following standards are met:

(1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[*N.J.S.A.* 30:4C–15.1(a).]

When applying that best-interests test, courts must bear in mind that the four prongs "overlap and provide a comprehensive standard for deciding what is in a child's best interest." *M.M.*, *supra*, 189 *N.J.* at 280, 914 *A.*2d 1265 (internal quotation marks and citation omitted).

From my perspective, the crux of this dispute centers on the two harm-related prongs. The first two prongs of *N.J.S.A.* 30:4C–15.1(a) comprise the harm requirement and are closely related to one another, so that "evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." *In re Guardianship of D.M.H.*, 161 *N.J.* 365, 379, 736 *A.*2d 1261 (1999). To justify the termination of parental rights the harm to a child need not be physical. *In re Guardianship of K.L.F.*, 129 *N.J.* 32, 43–44, 608 *A.*2d 1327 (1992) (citing *In re J.C.*, *supra*, 129 *N.J.* at 18, 608 *A.*2d 1312). Serious psychological or emotional harm resulting from

parental action *or* inaction can constitute sufficient grounds on which to terminate parental rights. *Id.* at 44, 608 *A.*2d 1327.

## B.

At the outset I note my agreement with the majority that the length of the father's delay in *In re D.M.H.*, a case in which this Court found that such delay provided sufficient grounds to terminate parental rights, was much more extensive than in this case.[8] That said, in my view, no one should view the time delay in *In re D.M.H.* as setting the limits for parental inaction that will spur a concern about the best interests of a child. The harm to a child, flowing from the denial of a parental relationship or from a biological parent's significant delay in coming to the decision to play a parental role in the life of a child, is harm that our child protection policies seek to eschew. In guardianship cases, concern about the deleterious effects from delay in moving a child into a stable, permanent home placement, where a lasting parent-child relationship may develop unhindered by outside influences, is an evident, animating principle of both substance and procedure.

A child's need for prompt stability and permanency is a central factor in our Court's guardianship cases. *See, e.g., In re K.H.O., supra,* 161 *N.J.* at 357, 736 *A.*2d 1246. We have "long emphasized New Jersey's strong public policy in favor of permanency." *P.P., supra,* 180 *N.J.* at 510, 852 *A.*2d 1093. New Jersey law has

---

[8] In *In re D.M.H., supra,* the father became aware in November 1993 that he was the biological father of two children, a three-year-old and a five-month-old. 161 *N.J.* at 373, 736 *A.*2d 1261. He expressed a desire to unite with his children, but he did not offer at that time to become their caretaker. *Ibid.* Eleven months later he informed the Division that he wanted the children to be placed with him, but he never returned the paperwork to initiate placement. *Ibid.* He did nothing further to claim a relationship with his children until March 1995 when he expressed a desire to resume visitation; however, he again failed to follow through and had no contact with the children from November 1995 to May 1996. *Ibid.* The Division filed an action to terminate his parental rights in March 1996, after two years and four months had passed during which the father repeatedly showed no interest and made no effort to care for his children. *Ibid.*

followed the general trend toward foster care reforms that limit the amount of time a parent may delay before providing for his or her children. *See In re K.H.O., supra,* 161 *N.J.* at 358, 736 *A.*2d 1246; *N.J. Div. of Youth & Family Servs. v. C.S.,* 367 *N.J.Super.* 76, 111, 842 *A.*2d 215 (App.Div.), *certif. denied,* 180 *N.J.* 456, 852 *A.*2d 192 (2004). That trend has seen a shift in emphasis "from protracted efforts for reunification with a birth parent to an expeditious, permanent placement to promote the child's well-being." *C.S., supra,* 367 *N.J.Super.* at 111, 842 *A.*2d 215. Following enactment of the federal Adoption and Safe Families Act of 1997 (ASFA), *Pub.L. No.* 105–89, 111 *Stat.* 2115 (codified as amended in scattered sections of 42 *U.S.C.*), New Jersey passed "An Act concerning children and families," *L.* 1999, *c.* 53 (codified as amended in scattered sections of *N.J.S.A.* 9 and 30:4C), to bring New Jersey law into conformity with ASFA. New Jersey's revisions reemphasized the importance of permanency to a child's well-being and the need for efficient and timely action to achieve that goal.[9] *See In re K.H.O., supra,* 161 *N.J.* at 358–59, 736 *A.*2d 1246; *C.S., supra,* 367 *N.J.Super.* at 111, 842 *A.*2d 215; *see also P.P., supra,* 180 *N.J.* at 511, 852 *A.*2d 1093. Plainly put, "[a] child cannot be held prisoner of the rights of others, even those of his or her parents. Children have their own rights, including the right

---

[9] It is telling that the majority's discussion of the applicable law begins by quoting *In re J.C., supra,* 129 *N.J.* at 7–8, 608 *A.*2d 1312, for the proposition that the law "clearly favors keeping children with their natural parents and resolving care and custody problems within the family." *Ante* at 165, 996 *A.*2d at 998. *In re J.C.,* however, was decided prior to the enactment of ASFA, which "put the safety and health of the child first" and rejected "the current system of always putting the needs and rights of the biological parents first." 143 *Cong. Rec.* S12,526 (daily ed. Nov. 13, 1997) (statement of Sen. Chafee); *see also* 143 *Cong. Rec.* H2021 (daily ed. Apr. 30, 1997) (statement of Rep. Hoyer) ("Our child welfare system too often protects parents' rights rather than children's rights."). Given that ASFA was motivated partially by state court decisions that removed young children from their adoptive families, with whom they had lived for the majority of their lives, and returned those children to their biological parents, and was intended to prevent such situations from recurring in the future, the majority's decision to remove four-year-old Richard Jr. from the only family he has ever known is even more confounding.

to a permanent, safe and stable placement." *C.S., supra,* 367 *N.J.Super.* at 111, 842 *A.*2d 215.

Even decisions of our Court that preceded the enactment of the best-interests test recognized that "equivocation and indecision on the part of ... natural parents ... are harmful to the well-being of the child and are relevant in the consideration of the issue of ... termination [of parental rights]." *Sorentino v. Family & Children's Soc. of Elizabeth,* 74 *N.J.* 313, 324, 378 *A.*2d 18 (1977). In my view, codification of the best-interests test has done nothing to eliminate such considerations from the harm analysis for there is an obvious harmful impact on a child from the withholding of parental care and nurture.[10] "[T]he attention and concern of a caring family 'is the most precious of all resources.'" *In re D.M.H., supra,* 161 *N.J.* at 379, 736 *A.*2d 1261 (quoting *A.W., supra,* 103 *N.J.* at 613, 512 *A.*2d 438). As such, I find ample support for the State's proposition that a parent's delay in assuming a parenting role with a child is the type of harm sufficient to trigger a termination of parental rights under the best-interests analysis, for "[a] parent's withdrawal of that solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." *Ibid.; accord In re Adoption of Children by G.P.B., Jr.,* 161 *N.J.* 396, 414, 736 *A.*2d 1277 (1999) ("[A] father who ... never makes efforts to be a part of a child's life sufficient to cause the child to view the person as a parent, causes harm to the child.").

Similar concern about avoiding the deleterious effects on a child from a biological parent's prolonged delay in establishing a parent-child relationship generally can be found in legislative pronouncements about parental inaction. Reflective of the fact that biology alone does not a parent make, these statutory pronouncements require a biological parent to demonstrate "biology plus," namely

---

[10] In this context, we have been careful to distinguish between the notion of "inadequate parenting," which is not in issue here, and the "failure to provide even minimal parenting." *In re D.M.H., supra,* 161 *N.J.* at 379, 736 *A.*2d 1261 (citing *A.W., supra,* 103 *N.J.* at 606–07, 512 *A.*2d 438).

some action to preserve the right to remain a parent to the child. The Legislature has decreed the performance of some parental-type duties within a specific timeframe in order to avoid losing one's legal right to be a parent to a child through charges of abandonment and the severing of parental rights through adoption or a guardianship action. *See N.J.S.A.* 9:3–46 (authorizing adoption over biological parent's objection when "during six-month period prior to the placement of the child for adoption ... the parent has substantially failed to perform the regular and expected parental duties of care and support of the child, although able to do so"); *see also N.J.S.A.* 30:4C–15.1(b) (authorizing termination of parental rights for abandonment based on parent's failure for six months to have contact with child, although able to do so). In light of the Legislature's plain concern to not foist on the child the harm caused by a parent's continuing failure to act as a parent, I can perceive no logical reason to eliminate the consideration of similar harm to a child, attributable to periods of parental inaction or failure to parent, from a more encompassing, best-interests-of-the-child analysis.

### III.

### A.

The analysis required by the best-interests-of-the-child standard is "extremely fact sensitive." *In re K.H.O., supra,* 161 *N.J.* at 348, 736 *A.*2d 1246. Indeed, in commencing an analysis based on prong one of the test, it is apparent to me that a one-size-fits-all approach is simply unavailing when assessing harm to a child caused by a delay in parenting. It is equally apparent to me that the first prong of the best-interests test was satisfied here.

Here, after initially categorically refusing to take in his biological son because his wife with whom he was living would not have the infant, defendant delayed in offering himself as a resource to care for his child until nine months had elapsed from the time he learned with certainty that the boy was his. Although he ad-

vanced various suggestions for possible placements for the child during that time period, he never offered to care for his child himself. Only when he was ejected from his marital home, when those family members that he had suggested proved unwilling to assume responsibility, when defendant learned that his sister would have to move from her apartment in order to be considered a possible placement for the child, then, and only then, did defendant offer to be the caretaker of his child. That delay in establishing a parental relationship with Richard Jr. was found to inure to the detriment of this developing young child. The trial court found that the months that elapsed were much more critical to the emotional well-being and development of young Richard Jr. than they were to defendant and, therefore, it felt compelled to view those months from the perspective of the person whose time clock matters most in a best-interests analysis: the child. As the trial court stated, "[w]hile [nine months] may seem like a short period of time, in this case, it is half of the life of the child."

I believe that it was eminently reasonable for the trial court to analyze the length of time that a parent has failed to provide care and nurture to a child from the unique perspective of the child, whose best interests must be paramount. Therefore, the court's analysis appropriately was influenced by the harmful impact of that delay due to the child's age and development, as that is essential in the fact-sensitive, individualistic harm analysis required under the best-interests test. *See ibid.* Generally, all other things being equal, a younger child will require a more time-sensitive commitment from a parent than an older child. *See* Elizabeth Buchanan, *The Constitutional Rights of Unwed Fathers Before and After Lehr v. Robertson,* 45 *Ohio St. L.J.* 313, 364 (1984) ("A child's need for permanence and stability, like his or her other needs, cannot be postponed. It must be provided early.").

A young developing infant/toddler's health, safety, and development depends on the establishment of a trusting relationship with a parent, whose love, nurture, care, and support permit the child

to develop and grow. It cannot be reasonably disputed that a biological parent's indifference or neglect in providing these essentials of parental responsibility can cause significant harm viewed from the perspective of the child's age-specific and developmental needs. Our decisions have emphasized that, in the context of termination hearings, it is the child's time clock that matters. *See In re K.H.O., supra,* 161 *N.J.* at 357, 736 *A.*2d 1246 ("[W]e have cautioned that placement plans must not lose sight of time from the perspective of the child's needs."); *see also A.W., supra,* 103 *N.J.* at 608, 512 *A.*2d 438 ("[T]here is a great tension here because, to the extent that adults—and when we speak of adults we mean courts, social workers, and therapists—delay the permanent decision, they lose sight of the child's concept of time."). Obviously, when assessing time from the viewpoint of the individual child's personal clock, one of the primary considerations has to be the age and development of the child. *See A.W., supra,* 103 *N.J.* at 607, 512 *A.*2d 438 ("There is a natural tendency to want to continue working with the parents to restore the family unit. How long a court should be willing to wait, however, depends in part on the age of the child.").

Other courts also have focused on the age and development of the child when faced with situations in which an individual hesitated to assume a parental role to his or her children, and have found it appropriate and necessary to view the harm from the child's time clock and point of view. *See, e.g., In re C.L.,* 178 *Vt.* 558, 878 *A.*2d 207, 213 (2005) ("[T]he paramount concern was [the] father's ability to resume his parental responsibilities for [his child] within a reasonable period of time, measured from the perspective of the child's needs."); *Robert O. v. Russell K.,* 80 *N.Y.*2d 254, 590 *N.Y.S.*2d 37, 604 *N.E.*2d 99, 103–04 (1992) ("Promptness is measured in terms of the baby's life.... The demand for prompt action by the father at the child's birth is neither arbitrary nor punitive, but instead a logical and necessary outgrowth of the State's legitimate interest in the child's need for early permanence and stability."); *In re Hall,* 99 *Wash.*2d 842, 664 *P.*2d 1245, 1250

(1983) ("That period of time which constitutes the 'foreseeable future' depends in part on the age of the child.").

With that body of law squarely supporting the approach taken by the trial court in this matter in respect of harm under the best-interests test, one should only need to determine whether there was sufficient evidence in the record to support the court's finding of harm under prong one. The court found that defendant's commitment to Richard Jr. was "questionable." That finding is entirely consistent with the evidence in the record. Defendant failed to offer himself as a resource to his son for nine months during which time Richard Jr. was between seven and sixteen months old, an essential period in the growth and development of Richard Jr. Dr. Perdomo, whom the trial court found to be "extremely credible," indicated that the period between six months and eighteen to twenty-four months is when a child bonds to his or her primary caretaker and internalizes that person as the person the child can trust and turn to for emotional support. Defendant had the opportunity to establish himself as that person for Richard Jr., but failed to take advantage of that opportunity. Instead, he decided not to provide the support necessary to establish himself as a father-figure to Richard Jr., visiting harm on Richard Jr. in the process through his inaction. If defendant had grasped that opportunity when it was presented to him, these proceedings would not be necessary.

The facts as they existed before the trial court presented a heart-wrenching and difficult case. However, I am left to conclude that defendant's hesitation in assuming a parent's care-giving responsibility for his son until the child was sixteen months old, concomitantly delaying in becoming the child's source of stable and permanent shelter, care, and nurture, constituted sufficient harm to Richard Jr. to satisfy the first prong of the best-interests-of-the-child standard. The trial court's conclusion to that effect was not "so wide of the mark" as to constitute a mistaken finding on this record. *M.M., supra*, 189 *N.J.* at 279, 914 *A.*2d 1265.

The majority, in finding that defendant's delay did not cause harm to Richard Jr., is forced to rely on the fact that during the time when defendant refused to care for his son, Richard Jr. "obviously was out of harm's way" because "he was safely in the care of foster parents while under DYFS's supervision...." *See ante*, op. at 169, 996 *A.*2d at 1001. Under the majority's circular reasoning, so long as the Division assumes care of a child when a parent refuses to do so, that fact would preclude a finding that the parent's delay harmed the child, no matter what impact the parent's delay had on the child.

The majority's rigid and inflexible approach fails to account for the specific needs of this child, Richard Jr., as those needs were expressed in the testimony before the trial court. There are no hard and fast rules that establish distinct parameters to the length of delay in parenting that will cause harm to a child, except, of course, for the statutory abandonment timeframes. *See N.J.S.A.* 9:3–46; *see also N.J.S.A.* 30:4C–15.1(b)(1)(a). The decision in *In re D.M.H.* certainly did not fix the minimal amount of time that a parent can delay in becoming a parent to his child while yet avoiding the termination of parental rights. Other factors besides length of time, such as the age and development of the child, will affect the degree of harmful impact resulting from a period of parental delay in parenting a child.[11] *See In re K.H.O., supra,* 161

---

[11] I note that, in an appropriate case, the reason for the parent's delay in holding himself or herself out as a resource for the child may also be relevant. *See In re J.C., supra,* 129 *N.J.* at 28, 608 *A.*2d 1312 (Clifford, J., concurring in judgment) (stating that "the role of the parent in contributing to the need for State intervention" should be considered in determining how long to wait for parent to assume parental role and responsibilities). The special needs of a child and the effect of the parent's delay in attending to those special needs may also be pertinent and may play a determining role, despite the reason for a parent's delay. *Cf. M.M., supra,* 189 *N.J.* at 291, 914 *A.*2d 1265 (noting that father's proposed plan was deficient in failing to account for his son's special needs). Here, however, defendant, although fully able to care for Richard Jr., was unwilling to do so and refused on several occasions to offer himself as a resource to his own son.

*N.J.* at 357, 736 *A.*2d 1246; *A.W., supra,* 103 *N.J.* at 607, 512 *A.*2d 438.

The determination of whether a parent's delay in providing care for his or her child equates to sufficient harm to terminate parental rights under the first prong of the best-interests-of-the-child standard must be an individual-specific, fact-sensitive determination, which recognizes that harmful impact can differ from child to child. A child is not a non-emotive being, able to be passed back and forth like a chattel without psychological consequences, but a growing and developing person in the midst of forming essential emotional contacts with his or her caretakers. The majority ignores this reality, and I cannot agree to sanction a finding that a parent who refuses to care for his or her child for more than half of the child's life does not cause harm to that child. Such an absurd result cannot be what the Legislature intended in enacting a standard governing the termination of parental rights that focuses on the best interests of the child.

## B.

The second prong of the best-interests test focuses on "whether the parent ... is unable or unwilling to provide a safe and stable home for the child, and whether a delay in permanent placement would add to the harm." *M.M., supra,* 189 *N.J.* at 283, 914 *A.*2d 1265 (quoting *N.J.S.A.* 30:4C–15.1(a)(2)). That includes inquiry into the "measures taken by the parent after the child's birth to maintain the parent-child relationship and to foster an environment leading to normal child development." *In re K.H.O., supra,* 161 *N.J.* at 352, 736 *A.*2d 1246. The "harms attributable to the biological parent include the prolonged inattention to a child's needs, which encourages the development of a stronger, bonding relationship to foster parents, which if severed could cause the child profound harm." *Ibid.* (internal quotation marks and citations omitted).

For this prong, "[t]o show that the child has a strong relationship with the foster parents or might be better off if left in their

custody is not enough." *In re J.C., supra,* 129 *N.J.* at 19, 608 *A.*2d
1312. Due, in part, to our recognition of and concern that there
are different psychological theories regarding the effects of paren-
tal bonding, *see id.* at 19–23, 608 *A.*2d 1312, we acted to assuage
those concerns by requiring that the Division "prove by clear and
convincing evidence that separating the child from his or her
foster parents would cause serious and enduring emotional or
psychological harm." *Id.* at 19, 608 *A.*2d 1312. Such proof
requires not only expert testimony concerning the child's relation-
ship to his or her foster parents, but also, in cases such as this one
where the fitness of a natural parent is not relied on by the
Division as a ground for terminating parental rights, an examina-
tion of the child's relationship with his or her natural parents.
*Ibid.*

Here, Dr. Perdomo testified that Richard Jr. would suffer
certain, severe, and irreversible harm if he were to be separated
from his foster parents. Richard Jr. would suffer from depression
in the short term, and long-term manifestations would include
difficulty in establishing relationships due to an inability to trust
other people. Dr. Perdomo based his conclusions on the bonding
evaluations he conducted between Richard Jr. and defendant, and
between Richard Jr. and his foster parents. Dr. Perdomo recog-
nized that defendant was a "fit" parent, having participated in the
raising of his four other children with his wife, and that defen-
dant's plan for caring for Richard Jr. was a "good plan" because
defendant realized that he would need an extended network to
assist him in caring for Richard Jr. Dr. Perdomo also acknowl-
edged the possibility that, if removed from his foster parents,
some of the resultant harm to Richard Jr. might be mitigated.
Mitigation would require, however, significant stability in order to
be realized.

All that considered, Dr. Perdomo opined that he held no convic-
tion that defendant would be able to provide the stability neces-
sary to mitigate the harm to Richard Jr. that would occur if he
now were pulled away from his foster parents. Because of the

circumstances defendant faced in his life as it existed at the time of the hearing, Dr. Perdomo did not believe that defendant would be capable of providing the nature and degree of stability that Richard Jr. would require to overcome the trauma of being severed from the only parents and home he had known in his life.[12]  The trial court found, in accordance with Dr. Perdomo's testimony, that defendant's plan was "realistic but not probable to occur."  I see no basis for disturbing that finding given the evidence in the record.

The majority sees fit to ignore the entirety of Dr. Perdomo's testimony and instead substitutes its own judgment about the harm to Richard Jr. and defendant's ability to mitigate that harm for that of a recognized expert child clinical psychologist.  The majority is only able to justify such an extreme approach, which is fundamentally inconsistent with the foundations of our child welfare jurisprudence, because it wholly mischaracterizes Dr. Perdomo's testimony.  The majority states that Dr. Perdomo opined that defendant was not a fit parent and that he ignored defendant's plan to care for Richard Jr.  Dr. Perdomo, in fact, did not present such one-sided testimony.  Dr. Perdomo never testified that defendant was an unfit parent; indeed, he acknowledged that defendant had successfully raised four children.  In regard to Richard Jr., Dr. Perdomo described the interactions he observed

---

[12] I pause to note that I do not suggest that consideration of defendant's "life circumstances" would be a sufficient independent ground on which to terminate his parental rights.  A careful reading of the trial court's opinion assures me, however, that defendant's "life circumstances" were presented by Dr. Perdomo and relied on by the trial court as factors that could introduce instability into defendant and Richard Jr.'s lives and, thus, came to bear on concerns about whether defendant would effectively be able to provide the stability necessary to mitigate the certain, severe, and irreversible emotional and psychological harm to Richard Jr. if he were separated from his foster parents.  The fact that defendant's life was then "in chaos" thus was pertinent to his ability to provide stability for Richard Jr. and his potential to effectively mitigate some of the harm that would be caused by removing Richard Jr. from his foster parents.  Consideration of defendant's "life circumstances" was not improper for that limited purpose.

between defendant and his son as indicative of a good relationship between them. And, despite the majority's statement to the contrary, Dr. Perdomo clearly accounted for defendant's proposed plan to care for Richard Jr., calling it both "a good plan" and realistic in that defendant recognized that he would require help caring for Richard Jr. Dr. Perdomo concluded, however, that defendant would be unable to provide the stability necessary to mitigate the harm that was certain to be inflicted on Richard Jr. if the child were separated from his foster family, primarily because of the stress, tension, and turmoil that defendant himself admitted permeated his life.[13]

Although one can be sympathetic to the plight in which defendant found himself, that plight was of his own creation. Unfortunately for him, his lengthy failure to act as a parent to Richard Jr. came during a critical portion of the child's life. Defendant's delay in offering care to his son not only caused Richard Jr. harm, it also necessarily resulted in Richard Jr. bonding closely with his foster parents. *See M.M., supra,* 189 *N.J.* at 291, 914 *A.*2d 1265 ("[T]he father's delay has contributed to the strong emotional bonds between the son and his foster parents, a natural conse-

---

[13] The majority does not, indeed cannot, take issue with Dr. Perdomo's conclusion in that regard or the trial court's agreement with that opinion. Instead, the majority casts aspersions on Dr. Perdomo's testimony with the incorrect assertion that Dr. Perdomo's opinion hinged on defendant's status "as a man who lacks a supportive wife as the basis for recommending that the child should not live with defendant...." *Ante* at 174, 996 *A.*2d at 1004. Dr. Perdomo faithfully reported the obvious factual circumstances that defendant faced. And, he simply repeated that defendant had told him that he was experiencing stress and associated problems in his life because his wife had left him as a result of his marital infidelity. Dr. Perdomo acknowledged that such tension was normal and entirely appropriate in light of defendant's circumstances. Dr. Perdomo did not state, or even suggest, that defendant was an inadequate caretaker because he was male or that female assistance was necessary to raise Richard Jr. Were the majority correct that Dr. Perdomo relied on antiquated gender roles in his testimony, I would share the majority's concerns. As it is however, the majority's invocation of this issue serves as a red herring to distract from the real issue in this case and provide the majority convenient cover for ignoring Dr. Perdomo's uncontested, balanced, and entirely appropriate testimony.

quence of the passage of time that is germane to the determination of the son's best interests. . . . This appeal demonstrates that reunification becomes increasingly difficult with the passage of time because a child may develop bonds with his or her foster family and gain a sense of permanency."). Dr. Perdomo's testimony established that separating Richard Jr. from his foster family, with whom he has lived since he was three months old, would inflict upon him certain and severe emotional and psychological harm.[14] The evidence supports the trial court's finding that the second prong of the best-interests-of-the-child standard was met. Because of the type of harm inflicted on Richard Jr., and the fact that defendant would not be able to mitigate effectively the harm, it is not a defense that defendant is currently a fit parent. *See In re Guardianship of J.N.H.*, 182 *N.J.* 29, 31, 860 *A.*2d 923 (2004) (affirming trial court's judgment "that [the child's] need for permanency and his identification with his foster parents as his psychological family warranted termination of the parental rights of [the mother], notwithstanding her present ability to be a fit parent"); *see also M.M., supra,* 189 *N.J.* at 292, 914 *A.*2d 1265 ("It is well settled that . . . a parent's fitness is not the touchstone under the best-interests standard."). In sum, I cannot conclude that the trial court's finding of harm under prong two was "so wide of the mark that a mistake must have been made." *Id.* at 279, 914 *A.*2d 1265.

## C.

Turning to the remaining parts to the best-interests test, prong three requires review of whether "[t]he [D]ivision has made

---

[14] This is not a case where the Division removed a child from his or her biological parents and placed the child with a foster family, thereby causing a child-foster parent bond to form, and then later attempted to rely on that bond as a basis for terminating the rights of the natural parents. *See In re K.L.F., supra,* 129 *N.J.* at 46, 608 *A.*2d 1327 (noting that child welfare system should "not tip the scales and encourage a foster parent-child bond to develop" when natural parent becomes fit and is anxious to resume custodial parent-child responsibilities). Defendant was asked to care for his son and refused the baby entry into his home.

reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights." *N.J.S.A.* 30:4C–15.1(a)(3). *N.J.S.A.* 30:4C–15.1(c) defines "reasonable efforts" as "attempts . . . to assist the parents in remedying the circumstances and conditions that led to the placement of the child," which are to include:

(1) consultation and cooperation with the parent in developing a plan for appropriate services;

(2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;

(3) informing the parent at appropriate intervals of the child's progress, development and health; and

(4) facilitating appropriate visitation.

The majority directs its ire at the Division for falling woefully short in its provision of services to defendant, particularly with regard to visitation. However, the majority puts the cart before the horse in requiring the Division to provide substantial unsupervised visitation in cases where the parent has repeatedly and consistently made clear that he or she has no interest in caring for his or her child. It is unclear what purpose the type of visitation envisioned by the majority is meant to serve in a case where the parent is not offering himself or herself as a caretaker for the child.

It is true that the Division's regulations presume an award of unsupervised visits by parents and require a court to state on the record a reason for imposing supervised visitation instead. *See* *N.J.A.C.* 10:122D–1.10(c). Under these circumstances, however, a conclusion that the trial court's order of supervised visitation was so wholly unsupportable as to result in a denial of justice is untenable. Although defendant was the biological father to the child, he was in the same position as a stranger in that he was unknown to the toddler. It would make little sense to force unsupervised visitation under such circumstances, especially when there was no evidence it was requested by this father, who was not even seeking custody of the child when the Division commenced

visitation. Moreover, defendant refused to change his position about his desire to be caretaker to his son until August 2007. Had defendant expressed a desire to care for his son when he was alerted that he was the boy's father, I would share the majority's concerns about the Division's efforts. But, under the circumstances as they existed here, defendant's argument that he and his family, none of whom accompanied him to the visits, were somehow prevented from establishing a closer bond with Richard Jr. due to the Division's failure to allow him unsupervised visits, rings hollow.

Defendant faults the Division for not expending reasonable efforts to assist him because it did not reasonably consider his proposed kinship caretakers as alternatives to termination of parental rights. That argument is without traction, however. We clearly have held that "when the permanency provided by adoption is available, kinship legal guardianship cannot be used as a defense to termination of parental rights under *N.J.S.A.* 30:4C–15.1(a)(3)." *P.P.*, *supra*, 180 *N.J.* at 513, 852 *A.*2d 1093. In this case, the foster parents want to adopt Richard Jr. Therefore, kinship legal guardianship does not provide a defense to the termination of defendant's parental rights.

In sum, although I would agree with the majority that courts must keep vigilant in their review of the Division to ensure that it fulfills its reasonable-efforts obligation, that obligation does not require that the Division remedy the parent's problem that caused the child to enter foster care. The parent must bear personal responsibility for that fix, with the Division assisting through the provision of services and supervision. Nevertheless, the child should not be kept "in limbo" while adults "hop[e] for some long term unification plan" to work out. *N.J. Div. of Youth & Family Servs. v. A.G.*, 344 *N.J.Super.* 418, 438, 782 *A.*2d 458 (App.Div. 2001) (citing *In re Adoption of a Child by P.S.*, 315 *N.J.Super.* 91, 121, 716 *A.*2d 1171 (App.Div.1998)). When behavioral changes are required, the parent must shoulder the brunt of changing, and in a decisive and meaningful way. In this matter, defendant simply

took too long to come to the realization that he would be willing to care for his very young son. Only he is responsible for his failure to step forward to be a parent to his child in a timely way. In the interim, the Division provided him with paternity testing, psychological evaluation, and parenting skills classes, and assessed all relatives he suggested. None of that could alter the behavioral change that only defendant could provide, namely coming to the realization that he wished to assume a caretaking, nurturing parental role for his son.

As for prong four of the best-interests test, it requires a finding that "[t]ermination of parental rights will not do more harm than good." *N.J.S.A.* 30:4C–15.1(a)(4). In this case defendant's contact with the child has been minimal compared to that of the foster parents, not because the Division vindictively kept him from his son, but because he consistently reiterated that he was unwilling to care for the boy. The expert testimony of Dr. Perdomo unequivocally was that Richard Jr. would suffer serious and enduring harm if removed from his foster home. On the other hand, Richard Jr.'s attachment to defendant was minimal. I agree with the trial court that there was clear and convincing evidence establishing that termination of defendant's parental rights would not do more harm than good.[15]

## IV.

In conclusion, I find that the record establishes that the trial court had clear and convincing evidence to support its determination to terminate defendant's parental rights. The family court conducted a thorough fact-sensitive inquiry in a difficult case,

---

[15] In a familiar refrain, the majority relies on "common sense" to substitute its own judgment for the uncontroverted evidence in the record and reach a different conclusion. This casual dismissal of the evidence that was presented at trial, which recurs throughout the majority's opinion, is troubling and sets a potentially dangerous precedent. We are plainly not qualified to substitute our own judgment about the harm that will befall a child in such a circumstance for the uncontested opinions of a qualified expert who testifies at trial.

deciding in the end that the father's interests did not coincide with the best interests of the child. A natural parent cannot take an unreasonable period of time to assume parental responsibilities. A reluctant father, who has not performed parenting functions and who delays unreasonably in offering to be a resource to care and nurture his own child, can cause the type of harm that the best-interests test is intended to ameliorate for a child.

Richard Jr. was in the limbo of foster care for eighteen months while defendant refused to take decisive and meaningful action. On the facts presented, and particularly in light of the uncontroverted expert evidence that defendant could not mitigate the serious and enduring injury to the child that would result from severance of his bond with his foster parents, I would affirm the trial court's holding that the Division has proved that Richard Jr. has been harmed by defendant's inaction.

I am sensitive to the fact that defendant was faced with an unpalatable choice. But, contrary to the majority's repeated assertion, it was not an impossible choice. And, conspicuously absent from the majority's opinion is any acknowledgement that defendant was faced with such a choice solely as a result of his own indiscretions. When defendant was confronted with the difficult choice, he did not hesitate in choosing, of his own free will, not to care for his son, despite the fact that a paternity test confirmed that he was the father. Instead, defendant remained with his wife who refused to raise the child that was a product of his extramarital affair. It was only nine months later, after defendant's wife kicked him out of the house and Richard Jr. was sixteen months old, that defendant regretted his decision. Such regret on the part of a father who repeatedly asserted that he would not care for his son does not provide a suitable basis for a court to separate the child from the family that raised him while his father was unwilling to do so. Defendant's parental rights should be terminated not because he made the wrong choice, but because of the harm that his choice inflicted on his young son.

Because the majority fails to appropriately account for the best interests of this child, I must respectfully dissent.[16]

Justices LONG and ALBIN join in this opinion.

*For reversal and vacation*—Chief Justice RABNER and Justices WALLACE, RIVERA-SOTO and HOENS—4.

*For affirmance*—Justices LONG, LaVECCHIA and ALBIN—3.

---

[16] Had defendant's parental rights been terminated in this matter, I would have taken the foster parents, who had hoped and planned to adopt Richard Jr., at their word when they promised to keep up contact between defendant and Richard Jr. post-adoption. They appropriately recognized, as do I, the value to Richard Jr. in continued visitation with his biological father. In light of the bare majority vote in this matter inalterably upending this young boy's life, that equitable result is not possible.