# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2350-17T2
                 A-2352-17T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

L.M.A. and A.C.,

      Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.I.A.,

      a Minor.

_____

Submitted March 13, 2019 – Decided March 28, 2019

Before Judges Nugent, Reisner and Mawla.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0170-17.

Joseph E. Krakora, Public Defender, attorney for appellant L.M.A. (Ruth A. Harrigan, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant A.C. (Victor E. Ramos, Assistant Deputy Public Defender, of counsel and on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason W. Rockwell, Assistant Attorney General, of counsel; Casey J. Woodruff, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith A. Pollock, Deputy Public Defender, of counsel; Todd S. Wilson, Designated Counsel, on the brief).

PER CURIAM

L.M.A. (Lisa) and A.C. (Allen), the parents of A.I.A. (Anna), each appeal from a January 5, 2018 judgment terminating their parental rights.[1] We affirm.

Lisa and Allen have had a long history of involvement with the Division of Child Protection and Permanency (Division). That history, in part, involved four other children who are not the subject of this litigation. Those four children are all older than Anna, who was born in 2016.

---

[1] We utilize fictitious names to protect the privacy of the parties and their children.

In 2005, the Division substantiated Allen for sexual abuse of a child. Between 2008 and February 2014, the Division received nine referrals relating to Lisa and opened a case in order to provide her with services.

In August 2014, the Division conducted a visit with Lisa, and noted she had a bruise on her face and a fading black eye. Lisa denied the injuries were from domestic violence and told the Division she was not in a relationship with Allen because he had been unfaithful. She claimed the injuries resulted from confronting Allen's paramour, who then retaliated with a physical assault. However, a police report indicated Lisa told police Allen punched and kicked her, bit her all over her body leaving three large bite marks on her back and one on her cheek, and struck her in the head with a glass jar.

In September 2014, the Division received another referral of domestic violence concerning Lisa. A caseworker who traveled to Lisa's apartment noticed the scent of marijuana. The caseworker also observed bruising on Lisa's face, and on one of her daughters. The Division referred Lisa to domestic violence counseling and requested urine screenings. She tested positive for marijuana and admitted to smoking marijuana while she was pregnant.

The Division learned of multiple domestic violence incidents between Lisa and Allen, and that Lisa's bruises were a result of Allen hitting her. Lisa

A-2350-17T2

and Allen agreed to a safety protection plan, which required Allen to leave the home to enable the Division to evaluate the risk posed to the children. However, Allen violated the safety plan, remained in the house, and assaulted one of Lisa's children. Given the prevalence of drug use and domestic violence in the household, the Division filed a complaint for custody of the four children living in the home with Lisa and Allen in October 2014.

In December 2014, the Division conducted a psychological evaluation of Lisa. Lisa denied any domestic violence between her and Allen, and denied Allen had ever hit the children. Lisa reported having chronic depression. She planned to reunite with Allen and reside together with the children. The evaluation concluded Lisa was attempting to conceal the history of domestic violence, and although Allen was incarcerated at the time, there remained a significant risk of domestic violence if they reunited. The evaluation recommended substance abuse screening and psychotherapy for Lisa due to her minimization of the domestic violence history. The evaluation also recommended a mental health evaluation of Allen in order to identify the risk factors for Lisa and the children, and Allen's treatment needs.

In January 2015, the Division conducted a psychological evaluation of two of the children, Jason and Leslie. The resultant report concluded they had

A-2350-17T2

suffered significant emotional harm from the exposure to domestic violence and physical abuse by Allen, and both children were "extremely frightened of [him.]" The report also noted "[t]here was a clear pattern of deceit and cover up by [Lisa] around [Allen]'s physical attacks on her in addition to what he was doing to the children."

In January 2015, Lisa stipulated to abuse or neglect of the children. Specifically, she admitted denying domestic violence in the home, despite marks and bruises on her face, and had violated the safety protection plan when she allowed Allen to return to the family home. Allen also stipulated he engaged in domestic violence in front of the children, violated the safety protection plan, and inappropriately physically disciplined the children.

Another child, Sally, was born in April 2015. The court granted the Division custody of her as well.

In May 2015, the Division conducted a second psychological evaluation, which noted Lisa had successfully met her substance abuse treatment recommendations, including negative urine screens, actively participating in therapy, and taking her medication. As a result, the report recommended allowing Lisa to have unsupervised visitation with the children. Although the report noted some concerns regarding Lisa's continued contact with Allen, she

denied any desire to reunite with him and claimed her main focus was her children. However, in September 2015, the Division learned Lisa brought the children to visit Allen in prison.

In August 2015, the Division performed a psychological evaluation of Allen. He reported a history of depression from molestation as a child, for which he had been taking medication. He also reported criminality as a juvenile and an adult, and domestic violence, and difficulty managing his anger. Allen admitted to assaulting Lisa while he was drunk because she discovered another woman texting him. Allen also claimed he had no plans to reunite with Lisa. The evaluation recommended he have relapse prevention counseling.

In November 2015, the Division filed a guardianship complaint for Adam and Sally. Shortly afterwards, Lisa attended another psychological evaluation. When the evaluator inquired about an engagement ring Lisa was wearing, she became emotional and proclaimed she still loved Allen. Also, despite an initial denial, Lisa admitted to using marijuana once. The evaluator noted Lisa was selective with the information she provided and denied any wrongdoing regarding the children. The psychological testing revealed she was depressed, had low self-esteem, and felt helpless and hopeless. The evaluator concluded Lisa was incapable of adequately parenting the children.

A-2350-17T2

In March 2016, the Division conducted a bonding and psychological evaluation of Allen with Adam and Sally. Allen admitted he had not seen Adam in two years and had never met Sally before the bonding evaluation. The evaluation noted Allen admitted to domestic violence with Lisa. He stated he and Lisa began fighting because of another woman, and said it "got ugly" and he "yoked [Lisa] up." He claimed this was the only incident of domestic violence, despite the objective evidence known to the Division of multiple other incidents. Allen also admitted striking Jason with a belt, but denied beating the children. The evaluation concluded Allen had difficulty adhering to limits, as evidenced by his recent incarceration, was not likely to be a viable parenting option for his children in the near future, and should not have any contact with Lisa.

The Division also conducted a bonding and psychological evaluation of Lisa in March 2016. She denied the children were ever physically disciplined or exposed to domestic violence. She claimed she only stipulated to abuse or neglect because she had a learning disability and was misinformed. She denied Allen had access to the children and that she ever used alcohol or marijuana, until confronted with evidence to the contrary.

A-2350-17T2

The evaluation concluded Lisa was minimizing the history of abuse and domestic violence between her and Allen, and failed to realize how it impacted her children. The report noted Lisa's failure to admit she was a victim of domestic violence demonstrated her inability to put her children's needs before her own. The report stated Lisa "minimize[d] personal faults and holds unrealistically positive perceptions of her level of psychological functioning. . . . As such, she may have difficulty responding effectively and flexibly to the changing demands placed upon her as a parent."

In pertinent part, the report recommended Lisa continue to participate in individual therapy to address her minimization of the domestic violence, the inability to place her children's needs in front of hers, and her tendency to seek out poor relationships. The report recommended Lisa not have contact with Allen. Notably, the report found Lisa had begun to address these issues and had a window of opportunity to make progress. However, if Lisa had contact with Allen, or relapsed, a termination of parental rights would be the only alternative.

In April 2016, Anna was born at Hackensack University Medical Center. She and Lisa tested positive for THC. Hospital records indicated Lisa denied using marijuana and blamed it on "smoke in the halls" of her apartment. She also denied a history of domestic violence and safety concerns for her and Anna.

A caseworker interviewed Lisa at the hospital. She reported smoking marijuana one time in March 2016, because of stress related to custody proceedings in court. She claimed marijuana remained in her system longer because she was a heavy set woman. She admitted she attempted to use her girth to hide her pregnancy and purposely left Newark for Hackensack to give birth in order to prevent the Division from taking her baby.

The court granted the Division custody of Anna in April 2016, and placed her in a non-relative resource home. Lisa continued to test positive for marijuana in a series of weekly screenings following Anna's birth.

In June 2016, the guardianship trial for Adam and Sally occurred. The Division presented testimony of its expert, who had performed the psychological evaluations of Allen and Lisa. The expert testified Allen was unfit to parent either of the children because of his past history of domestic violence and physical abuse of the children, and that Lisa hid this history during the evaluation process. The expert noted, that despite confronting Lisa with evidence within the Division's record to the contrary and giving Lisa the opportunity to recant her misrepresentations, she remained untruthful. As a result, he concluded Lisa was also unlikely to be a viable parenting option for Adam and Sally in the foreseeable future, because "one of the themes that has

occurred over time is this theme of secrecy and deception." The expert noted he could no longer recommend Lisa have additional time to demonstrate progress towards reunification because of her inability to be truthful.

Allen also testified, and represented he had participated in life skills, anger management, domestic violence, drug treatment, and parenting programs during his incarceration. He claimed he had not violated the safety plan because he refused to see the children when Lisa brought them to the halfway house to visit him. He also claimed he did not have any contact with Lisa since his release from incarceration in November 2015, and had no future plans to parent with her. Allen denied striking Jason. He admitted to one incident with Lisa in which he threw a chair at her and bit her, but claimed she hit him. He also admitted he and Lisa had attempted to conceal his identity from the Division. Allen also denied Anna was his daughter because she was conceived while he was incarcerated.

In June 2016, the court terminated Lisa's and Allen's parental rights to Adam and Sally. We affirmed both decisions. N.J. Div. of Child Prot. & Permanency v. L.M.A., Nos. A-4929-15, A-4931-15 (App. Div. June 11, 2018).

In this case, Lisa participated in intensive outpatient treatment following Anna's birth, no longer tested positive for drugs, and completed a substance

abuse treatment program. She also agreed to attend domestic violence counseling. A paternity test confirmed Allen was Anna's father and he was joined as a party in this matter.

In October 2016, both parents met with the Division to discuss visitation. Again, each denied there was domestic violence. In November 2016, Allen enrolled in a residential program for substance abuse treatment, domestic violence and abuse counseling, mental health group therapy, and parenting classes.

Following a permanency hearing on December 13, 2016, the court approved the Division's plan for termination of parental rights followed by adoption. The court found Lisa and Allen had failed to remediate the issues, which caused Anna's removal.

Throughout December 2016 and January 2017, Lisa sought mental health treatment for her anxiety and chronic depression. She continued to express a desire for a relationship with Allen and reported "the person [I] love [I] can[']t be with."

The Division assessed whether Lisa's mother would be a viable option for Anna's placement. However, a psychological evaluation determined she was

11

incapable of providing adequate parenting for her grandchild. She was also listed in the Division registry as a substantiated perpetrator of neglect.

In April 2017, the Division conducted updated psychological evaluations with Lisa and Allen, and also performed comparative bonding evaluations for each parent and Anna's resource parent. Lisa continued to deny Allen had physically abused her children, and denied her children had ever witnessed domestic violence. She also denied having any contact with Allen since Anna was born. The evaluator reported Lisa appeared to be sober, had no active symptoms of mental illness, and if she remained on a positive trajectory, there was a possibility she could become a viable parenting option.

Allen told the evaluator he had previously engaged in domestic violence with Lisa, but said he was no longer in contact with her. Allen wished to reunite with Anna and indicated he completed substance abuse treatment as a part of his parole. Allen also stated he had completed parenting skills and anger management training, and was currently taking medication for his bipolar disorder. Because of Allen's own history as a victim and perpetrator of sexual abuse, the Division referred him for a psychosexual evaluation.

The bonding evaluations revealed Allen and Lisa were affectionate and appropriate with Anna, and she had developed a level of comfort with each of

them.  The evaluator opined Lisa was more likely to become a viable parenting option than Allen, but she would have to maintain her sobriety, participate in a relapse prevention program, therapy, and medication monitoring.  However, a failure to comply would most likely leave termination of parental rights as the only option.  Likewise, the evaluator opined Allen could become a viable placement option if he complied with substance abuse treatment, therapy, and medication monitoring, in addition to the aforementioned psychosexual evaluation.  The evaluator concluded both parents should have a period of four months to build on their progress.

The bonding evaluation with the resource parent found she was very engaging with Anna, and the child's relationship with her resource mother had a deeper quality and intensity than with her biological parents.  The foster mother had been caring for Anna since her birth and wished to adopt her.  The evaluator noted because Anna and her resource parent had the foundation for a healthy attachment, Anna would internalize the attachment by the time she was two years old, and the passage of time increased the risk of enduring harm if the child was returned to her biological parents.

In April and May 2017, the law guardian's expert performed psychological and bonding evaluations.  Lisa continued to deny marijuana usage while she was

pregnant with Anna and downplayed the history of domestic violence. She denied having a relationship with Allen following his incarceration. The evaluation concluded Lisa had a long history of being "deceitful and manipulative" with the Division, citing her interference with Division investigations, concealment of Allen's criminal background, and hiding the pregnancy. The evaluator also questioned Lisa's commitment to sobriety and her capacity to have a healthy and safe relationship, because she minimized the history of domestic violence and marginally engaged in relapse prevention services.

During his evaluation, Allen stated he was still living at a halfway house and hoped to leave by July 2017. He claimed he was taking prescribed medication and finding success in therapy. He intended to secure housing, go to school, continue attending treatment, and win custody of his children. Allen claimed he and Lisa ended their relationship during his incarceration.

The bonding evaluations on behalf of the law guardian concluded Anna had a closer, healthier, and stronger bond with the resource parent than with either biological parent. The evaluation concluded Lisa had the skills necessary to act as a babysitter or school aide, but lacked a deep and intense emotional attachment to Anna. The evaluator also noted Lisa did not understand the issues

14

of attachment or the difficulties Anna would experience by removing her from her resource parent. The expert expressed the same concerns regarding Allen, and emphasized Allen had not demonstrated the capacity for independent living outside of the halfway home. The expert also noted although each parent had claimed their relationship had ended, they had provided inconsistent reasons for its demise, and previously misled the Division regarding their association without remorse.

Throughout the summer of 2017, Lisa continued to have supervised visits with Anna. Although Lisa had been attending a domestic violence program, she demonstrated poor judgment because she lacked insight into the harmful nature of her relationship with Allen. Allen fell out of contact with the Division and ceased visiting Anna.

Anna's guardianship trial occurred on four dates in September, October, and November 2017. Allen did not attend trial. Without objection, the trial judge took judicial notice of the prior guardianship matters.

The Division caseworker assigned to the family since September 2016, testified and authenticated the Division's records without objection. The caseworker explained the children's removal in 2014 due to domestic violence and the parents' attempts to conceal it, the violation of the safety plan, and Lisa's

attempts to conceal her pregnancy from the Division. The caseworker also explained the Division's attempts at reunifying the family.

The law guardian's expert testified consistent with her report. She reiterated Anna would not suffer harm if she was separated from either parent, and her foster mother would be able to mitigate any type of harm that would arise. The expert cited Lisa's and Allen's previous history with the Division as evidence of future harm to Anna. The expert testified Lisa lacked insight into the impact domestic violence and abuse had on her children, and Allen's failure to remain in contact with the Division was a poor reflection of his commitment to Anna.

As to both parents' history of deception and misrepresentations to the Division, the expert opined the parents told authority figures what they wanted to hear in order to avoid scrutiny. The expert noted this conduct was problematic because it was contrary to a parent's obligation to be truthful with doctors, teachers, and others in order to meet their child's needs.

Notably, the law guardian's expert disagreed with the Division's expert, who stated that allowing Lisa additional time to engage in reunification services would not harm Anna. The law guardian's expert explained Lisa would need to

be sober for eighteen to twenty-four months in order to achieve remission and the passage of more time deprived Anna of permanency.

The Division's expert testified a termination of parental rights would not cause Anna more harm than good. The expert stated Anna was at risk of harm due to the possibility of Lisa reuniting with Allen, given the couple's previous pattern of unauthorized contact and violation of the Division's safety plan. According to the expert, Lisa did not have sufficient understanding of how domestic violence impacted her children. Although Lisa had been drug-free, she had a history of relapse and failed to regularly attend relapse support meetings. The Division's expert could not recommend reunification with Anna based on Lisa's history of deception, especially regarding domestic violence. The expert also could not recommend reunification between Allen and Anna because Allen did not submit to the psychosexual evaluation.

The Division's expert concluded both parents had not fully complied with his recommendations. He noted his initial recommendation of a reevaluation period of three-to-four months was primarily to afford Anna permanency and this time had passed without marked improvement by either parent.

Lisa also testified. Despite evidence to the contrary, she insisted the children did not witness domestic violence and she had no intention of reuniting

with Allen. She admitted she misrepresented her past marijuana use, but claimed she had not used or tested positive since July 2016. Lisa denied attempting to conceal Anna's birth from the Division, the history of violence, and that she knew Allen was Anna's father. She also denied violating the Division's safety plan.

On January 5, 2018, the trial judge issued a written decision finding the Division had met the four-prong best interests of the child test under N.J.S.A. 30:4C-15.1(a), and signed a judgment granting the Division guardianship of Anna. The judge found the testimony of the caseworker and both experts credible. He did not find Lisa credible and noted she "continue[d] to provide untruths and conflicting information" regarding her history of domestic violence and the custody of her children.

## I.

On this appeal, Lisa raises the following points of argument for our consideration:

> POINT I: THE LOWER COURT ERRED IN FINDING THAT ALL FOUR PRONGS OF THE BEST INTERESTS TEST FOR TERMINATION WERE PROVEN BY CLEAR AND CONVINCING EVIDENCE AND THEREFORE THE JUDGMENT OF GUARDIANSHIP SHOULD BE REVERSED.

(A)   THE TRIAL COURT'S FINDING THAT LISA CAUSED HARM BY NOT BEING TRUTHFUL WITH DCPP, TO A DEGREE THAT SATISFIED THE FIRST STATUTORY PRONG, IS UNSUPPORTED BY THE RECORD.

(B)   THE JUDGMENT TERMINATING LISA'S PARENTAL RIGHTS SHOULD BE REVERSED BECAUSE THE EVIDENCE DOES NOT SUPPORT THE TRIAL COURT'S CONCLUSION THAT LISA IS UNABLE TO PROVIDE [ANNA] WITH A SAFE AND STABLE HOME.

(C)   THE TRIAL JUDGE ERRED IN HIS DETERMINATION THAT DCPP SATISFIED THE REASONABLE EFFORTS STANDARD BECAUSE IT FAILED TO PROVIDE SERVICES THAT WERE REASONABLE UNDER ALL THE CIRCUMSTANCES AND THE COURT DID NOT EXPLORE ALTERNATIVES TO TERMINATION.

1.   The Trial Judge Erred In His Determination That DCPP's Unreasonable Cookie Cutter Approach, Rather Than Tailored Services, Satisfied The Third Prong Of The Test.

2.   The Trial Court's Reliance On DCPP Being Relieved Of Efforts Was Error Because The First Termination Action Was Still On Appeal And Not Final.

3.   The Trial Judge Failed To Make A Determination That DCPP Considered Alternatives To Termination.

19

(D) THE JUDGMENT TERMINATING LISA'S PARENTAL RIGHTS SHOULD BE REVERSED BECAUSE THE RECORD LACKS RELIABLE AND COMPETENT EVIDENCE TO SUPPORT THE TRIAL COURT'S LEGAL CONCLUSION THAT TERMINATION OF PARENTAL RIGHTS WILL NOT DO MORE HARM THAN GOOD.

POINT II: TRIAL COUNSEL'S FAILURE TO OBJECT TO THE ADMISSION OF TRANSCRIPTS FROM LISA'S PRIOR TERMINATION TRIAL CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL AND WARRANTS REVERSAL. (Not Raised Below).

Allen asserts the following points in his appeal:

POINT I. TERMINATION OF [ALLEN]'S PARENTAL RIGHTS WAS NOT WARRANTED UNDER THE "BEST INTERESTS TEST" OF N.J.S.A. 30:4C-15.1(A).

A. The Court Erred In Deeming The First Prong Of The Test Satisfied By Clear And Convincing Evidence Where [Anna] Was Not Harmed By The Circumstances Resulting In Her Removal, Where Her Safety, Health And Development Was Not Endangered By [Allen] Availing Himself Of Services Addressing Any Such Risk And Where The Court Erroneously Relied On An Impermissible Child Hearsay Allegation That Informed A Psychological Recommendation Underpinning Its Finding Of A Risk Of Harm.

B. The Court Erred In Deeming The Second Prong Of The Test Satisfied By Clear And

20

Convincing Evidence Where [Allen] Self-Enrolled And Availed Himself Of Services At A Residential Substance Abuse Treatment Program, Obtained Employment And Housing And Presented A Plan For [Anna's] Care By The Time Of The Guardianship Trial (Sic).

C. The Court Erred In Concluding Prong Three Of The Test Satisfied Where The Record Does Not Establish That The Court Fully Considered Alternatives To Termination Of Parental Rights When DCPP's Rule Out Of A Relative On Best Interest Grounds Was Based On An Unnamed Expert Not Present At The Guardianship Trial For Cross Examination.

Having reviewed the record, we conclude that these arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We affirm substantially for the reasons stated by the trial judge. We add only these comments.

In striking a balance between a parent's constitutional rights and a child's fundamental needs, courts employ the four-part guardianship test articulated in N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 604-11 (1986), and codified as N.J.S.A. 30:4C-15.1(a):

> a. The division shall initiate a petition to terminate parental rights on the grounds of the "best interests of the child" pursuant to subsection (c) of section 15 of P.L. 1951, c. 138 (C. 30:4C-15) if the following standards are met:

21

(1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from [her] resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

In their application, the four factors above "are not discrete and separate, but relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 167 (2010) (quoting N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 606-07 (2007)).

In reviewing the trial judge's decision, we must defer to his factual findings unless they "went so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty, Inc. v. BMW of N. Am. Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). So long as "they are 'supported by adequate, substantial and credible evidence,'" a trial judge's factual findings will not be disturbed on appeal. In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 483-84 (1974)). We owe special deference to the trial judge's expertise in handling family issues. Cesare v. Cesare, 154 N.J. 394, 411-13 (1998).

Having reviewed the record, we conclude the trial judge's factual findings are based on sufficient credible evidence, and in light of those findings, his legal conclusions are unassailable. The record amply supports his decision that the termination of parental rights is in Anna's best interests.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2350-17T2